189] *MORRIS v. EDWARDS.

Contract to pay two thousand dollars in current bank notes of the city of Cincinnati is a contract to pay money, if the notes be neither paid nor tendered at the time.

Such contract, if made in writing, is not ambiguous, and can not be explained by parol testimony.

Facts of recent occurrence, relating to a particular section of country only, can not be considered as in proof from general knowledge or recollection.

MORRIS brought an action in the supreme court of Hamilton county, upon a note in writing, in the following words:

" *On the first day of February, in the year* 1822, *I promise to pay James C. Morris, or order (in current bank notes of the city of Cincinnati), two thousand dollars, with interest, for value received. December* 25, 1819."

This case was put to trial on the general issue. The defendant offered evidence, that at the time of making the contract, and executing the note, business was done in Cincinnati upon a depreciated circulating medium, consisting chiefly of the notes of the banks of Cincinnati and the vicinity—that the value of property was estimated by the numerical value of these notes, and that when payment was stipulated to be made in current bank notes, property was put at a higher price than it would have been if the contract was for specie—that the difference between the numerical value and the specie value of current bank notes, when this contract was made, was thirty-three and one-third per cent.—that at the time the note became payable, there was no depreciated bank paper in circulation in Cincinnati, nothing being current but specie, or bank notes of specie value. This evidence was offered for the purpose of showing that the plaintiff ought not to recover the full sum of two thousand dollars, but two-thirds of that sum, with interest. The question, as to the admissibility of this evidence for the purpose proposed, was reserved for the decision of this court.

200

WADE and HAYWARD, for plaintiff:

The principal question for the consideration of the court is, whether the sum of two thousand dollars, mentioned in said note, with the interest due thereon, shall be recovered in *specie*, out of which the following points have been made:

1. Whether there is such an ambiguity in the language or terms made use of in this note, as to require parol or other evidence to explain or ascertain its true meaning, the rights of the parties, and the extent of the defendant's liability?

*2. Whether, by the terms of the contract, the defendant, [190 after having failed to make the payment, in the manner and at the time stipulated, is liable for the full amount of the principal sum mentioned in the note, with the interest due thereon in *specie?*

3. Whether it is competent for the defendant to offer testimony to prove a consideration *less* than that expressed in the note, or of a different character, with a view of reducing the amount of damages to be recovered?

4. Whether it is competent for the defendant to offer evidence to prove the value of "current bank notes of the city of Cincinnati," at the time said note was given, or at the time the payment thereof became due?

1. What is, and what is not a latent ambiguity, is well known and understood by the court, and need not, in this enlightened age of legal science, be a subject of discussion. The note declared on is an *entire* contract, unequivocal in its terms, and clear and explicit in its legal import. *Bank notes* is a term long since known to the law, and has received a construction, by the highest judicial tribunals. 1 Burr. 457. But if it were now to be considered for the first time, the term *current*, a word, when applied to money or any other medium of mercantile exchange, of universal and unvarying import, would remove from the expression all doubt and uncertainty, without the aid of external evidence. This note, therefore, must receive a construction from the language in which it is drawn, and not by parol proof; because the written terms of a contract, where there are no latent ambiguities, are better evidence of the intention of the parties than any parol explanation. As where, by the terms of a contract or agreement in writing, the court can give it such a construction as is known to the law, the intention of the parties and their respective rights and liabilities, are to be ascertained from the instrument itself, and no other evi-

dence will be admitted to change or vary its legal bearing and effect. "In a written simple contract, not within the statute of frauds, where the whole agreement is reduced to writing, and in which there is no latent ambiguity, parol evidence can not be admitted to explain such contract, the language used by the parties therein being the best evidence of their intent." 6 Mass. 524; 2 Bos. & Pul. 555.

2. In the argument of the second point, it will be attempted to draw into the discussion, the peculiar circumstances of that portion or section of the state where this promissory note was executed, with a view of giving to this contract a different rule of construc-191] tion *from that which has long and uniformly been adopted as the established principle of law. But it is confidently believed that neither a temporary state of commercial embarrassments, arising from an unprofitable course of trade and mercantile transactions, nor that unfortunate state of things which grows out of the insolvency of banking institutions, by which a fictitious and fluctuating medium of exchange is left upon the community to circulate at a depreciated value—can change or alter the law of contracts, or influence a legal decision. The fluctuations in trade and in the market value of private property, and the revolutions which take place in the circulating medium of a country, although in their consequences frequently injurious to some, while they advance the pecuniary ability of others, are the subjects of legislative investigation, and not of judicial inquiry. The property of individuals is always more or less affected by unexpected events and unforeseen embarrassments, while their *rights*, as ascertained and defined by the laws of society, remain unchanged and unimpaired. What bearing, then, can the failure of banking institutions, and the consequent evils which followed their inability to meet their engagements and sustain their credit, by which a partial circulation of their paper, at a depreciated value, was permitted for a time, have upon the rights of the present plaintiff, or upon the legal construction of this note and the liability of the defendant? None is perceived, and it is suppposed to be difficult to imagine any.

It is not pretended that the whole agreement of these parties was not reduced to writing, or that there is any latent ambiguity in the note, requiring the aid of parol proof to ascertain its true meaning; and it surely can not be urged, in *this suit*, that there is

a *mistake* in the terms of the note, or that it is contrary to the truth of the case, because such a defense is not permitted in a court of law; and the party can only obtain relief by a bill in equity, at the hands of another tribunal. 7 Johns. 342; 7 Bro. P. C. 70; 1 Johns. Ch. 707; 2 Johns. Ch. 274; 3 Cranch, 419.

The language made use of in this note can not be mistaken. The words "*in current bank notes of the city of Cincinnati,*" form a clear and unequivocal expression, and have a legal import and effect, which the court only can give; and if, in the mode and manner of their arrangement, any doubts should be entertained of their true meaning, or of the meaning of the whole expression, those doubts must be removed by a sound construction of the words themselves, and not by any parol explanation.

*Bank notes* have long been considered as *money,* as *cash,* [192 and have been so decided. " They are not esteemed as goods, securities, nor documents of debt; but are treated as *money,* as *cash,* in the ordinary course and transaction of business, by the general consent of mankind; which gives them the credit and currency of *money* to all intents and purposes." " They pass *by a will,* which bequeaths all the testator's money or cash, and are *never* considered as *securities* for money, but as money itself." No action will lie against the finder of a bank note, *after* it has been paid away in currency. 1 Burr. 457.

But, in the present case, the parties have gone *further* than the simple expression *bank notes.* They have said *current* bank notes of the city of Cincinnati. This, it is contended, is an expression too clear and definite to admit of any doubt. *Current* bank notes, if they have any meaning or legal effect, are the paper of such banks as pay their notes *in specie on demand,* and not such as may obtain a circulation at a *depreciated value;* and if such had not been the meaning and intention of these parties, they would have introduced some other term of qualification.

Again—here is an absolute promise to pay the sum of two thousand *dollars,* without any designation of the kind or quality of money. The words in the parenthesis must be construed as providing for the payment of that sum, *at the time stated, in* current bank notes, etc., without fixing upon any rate or value at which they should be received. If the promise had been to pay two thousand dollers *of* " current bank notes," etc., it is possible a different construction would have been given to the instrument.

Morris *v.* Edwards.

But, in this case, the consideration received and the promise to pay are two thousand *dollars;* and if it should be considered that *current bank notes* are not *cash,* not *money,* but merely articles of trade and speculation, as goods, wares, and merchandise, the rule of damages would still be the same,

Here the defendant has acknowledged that he has received the value of two thousand dollars, and has promised the plaintiff to pay him the same, at a certain time, with the interest, " in current bank notes," etc.   He has failed to make the payment at the time and in the manner stipulated in the contract; and will the court say the measure of damages to be recovered shall be *less* than the consideration acknowledged to have been received?   If the contract should be construed as an obligation for the payment of *specific articles,* the parties have fixed their value by the very terms 193] of the note itself.   *The promise to pay the principal sum *with interest,* is the strongest, if not conclusive evidence, of the amount of the debt due, and of the right of the plaintiff to recover the same in *specie.*

There is a manifest distinction between a contract to pay or deliver a certain quantity of *specific* articles, and an obligation to pay the amount of a certain sum of money *in specified* articles. In the one case, on a failure to pay and suit brought, the measure of damages would be the value of the articles promised to be paid or delivered *at the time when they were due.*   In the other, the sum of money mentioned in the obligation is the amount to be recovered, the value of the articles to be paid being fixed by the parties in the terms of the contract.   If A., by his promissory note in writing, expressed for value received, promise to pay or deliver to B. one hundred bushels of corn in six months from the date thereof, and fails to comply with his engagement, in an action by B. against A. on such note, B. will be entitled to recover the value of the one hundred bushels of corn, *at the time* when, by the contract, it was to have been paid or delivered.   And *why ?*  Because the real sum due has not been liquidated by the parties in the note, and there is no other rule of damages by which the plaintiff can obtain ample and complete justice for the injury he has sustained.   But if A., by his promissory note in writing, expressed for a valuable consideration, promise to pay B. the sum of one hundred dollars, *in* corn, six months after the date thereof, without stating the price at which the corn should be paid or re-

ceived, and fails to make the payment as stipulated, in an action on this last described note, B. would be entitled to recover the said sum of one hundred dollars, with interest thereon from the time the note became due. And *why ?* Because the real sum due has been ascertained and fixed by the parties in the note itself; and where, in the instrument declared on, the law has fixed the rights and liabilities of the parties, and the rule of damages to be recovered, no other rule is permitted to govern, nor is it competent for the defendant to introduce parol evidence to change or vary its legal operation. So, in the present case, the sum due on the maturity of the note has been fixed by the parties at two thousand dollars and the interest; and the provision that payment should be made *in* a particular, kind of money, or in certain specified articles *at a particular time*, does not affect the amount due for which the defendant is now liable, nor can it change or affect the measure of the damages to be recovered.

3. It is admitted, that notwithstanding a promissory note is expressed to be for value received, the promissor, in an action by the *promisee, may prove there was *no* consideration, or [194 that it was unlawful or against public policy; but the defendant is never permitted to give evidence of a consideration *less* than that he has acknowledged in the instrument. 1 Johns. 139; 5 Mass. 299.

Where A., by his promissory note in writing, for value received, promised to pay B. a certain sum of money *in lands* at a *stipulated price per acre*, and failed to make the payment according to his promise, in an action by B. on said note, the note itself was considered *prima facie* evidence of the value of the land, and the defendant was not permitted to show that the land was of *less* value than the consideration named in the note; and the note was considered competent evidence to support the money counts. 2 Johns. 235. "It is a settled rule that where the consideration is expressly stated in a deed, and it is not said also, and for other considerations, you can not enter into any other, for that would be contrary to the deed." 7 Johns. 342. The same rule applies in parol contracts. 1 Johns. Ch. 370.

Whether there is or is not a lawful consideration to support a promise is a matter of fact, and parol evidence may be admitted to disprove it; but where in a written contract the promise is founded on a consideration expressed to be *for value received*, it is not com-

petent for the defendant to show, in point of pecuniary calcula-
tion, it was not equal to his obligation. Besides, although under
the general issue, the defendant may give in evidence any matter
which shows the plaintiff *never* had any cause of action, and also
matter in *discharge* of the action, or which shows that the plaint-
iff, at the time of the commencement of the suit, had no subsist-
ing cause of action; yet by our practice act, and the construction
which it has received, the defendant in this suit can not, under
any circumstances, go into the *amount* of the consideration of this
note, without pleading the same specially, or giving to the plaint-
iff notice, under the general issue, that he should offer testimony
for such purpose.

4. This point, as stated, will not require any discussion. If the
court should be of opinion that the amount of damages to be re-
covered shall be the value of the bank notes mentioned in the
note declared on, at the time the said note was given, or when the
payment thereof became due, to be ascertained by *parol evidence,*
the *plaintiff* will be bound to prove the value of such bank notes
before he can obtain his judgment.

**195]** Este, for defendant:

1. In every contract, the intention of the parties, if it can be as-
certained, should prevail.

2. This intention, in the case under consideration, is to be known
from the expression in the note, "*in current bank notes of,*" etc., and
evidence of what they and their value were.

Whenever the circulating medium of a people changes, or un-
dergoes any alteration, contracts will be made accordingly. This
may either be general or local.

Expressions will be inserted in contracts to meet the change.

It is a fact admitted, that at the time of the execution of the
note, and before, and some time since, the common circulating
medium in Cincinnati and its neighborhood was the notes of their
banks, and of those contiguous. It is a fact, that for three or four
years nearly the whole business of the place was transacted on this
paper. It is unnecessary to mention other parts of the country.

During this period the terms "current bank notes of the city
of Cincinnati," "bankable paper," "current bank notes or paper,"
were inserted in contracts and had a meaning attached clearly and
perfectly understood by the contracting parties and the com-

munity.   The prices of commodities were regulated by the change, also the real property of the town and country.

It will not be denied that, if tendered when due, the paper should have been received.   It will be admitted that the paper was not equal to specie.   If not paid, then, at the time, the real damage sustained was the value of the paper, and this should be the criterion of recovery.

The meaning attached to the terms above named was, that the payor was to pay the $2,000 *in numero*, according to the face of the bank notes—not to pay the sum of $2,000 in anything equivalent to specie.   Thus a note of one of the banks for $10, was spoken of as a note for ten dollars, was treated as such, when the real value was only $6.66⅔.   A contract for the payment of ten dollars "in current paper,' or " bankable paper," etc., was clearly understood for the nominal amount according to the face of the note.   If this were the understanding and intention of the parties, it would be manifestly unjust that the payor should be compelled to pay a dollar in specie for what, in his contract, was treated as a dollar in paper, and of the real value of two-thirds of a dollar in specie.

The evidence will be received, because it shows what this paper was, and its value.   Besides, when a phrase is inserted in a contract, *to adapt itself to the change in things, there is no  [196 rule that a meaning should be affixed applicable to a different state.

HAMMOND, on the same side :

The action is founded upon a promissory note, by which the defendant promised to pay the plaintiff, or order, in current bank notes of the city of Cincinnati, two thousand dollars, at a future day.   The amount was not paid or tendered at the day.   The defendant contends that the contract was predicated upon a particular state of the business in the country where it was made, to which the terms of the note refer, and that the amount in coin that he is bound to pay must be determined by giving to the terms used in the note an interpretation connected with the history of the times in which it was made.

To this the plaintiff objects, in the first place, that it is an at·tempt to explain, by parol, a written contract, in which there is no ambiguity that requires or warrants such explanation.

Morris *v.* Edwards.

This objection, I think, is founded upon a mistaken view of the point. The proposition is not an offer to prove an isolated fact, confined altogether to this individual and particular contract. It is to such cases that the reasonings and the authorities of the plaintiff apply. We maintain that certain terms used in the note are to be understood and interpreted by a reference to the general state of business at the place where the note was given, a matter of fact, applicable to all similar contracts, and to be ascertained by a knowledge of the general history of the country.

The case from 1 Burr. 457, cited by the plaintiff, is full in point to support our position. The character there given of bank notes is deduced from general facts connected with the business of the country. It is not pretended that they are in fact money, but that, by the general consent of mankind, they are treated as money in the transaction of business. For what purposes, to what extent, and in what sense they are treated as money, are matters of fact which do not depend upon the particulars of the contract between the parties, but upon the general course of trade and business at the time when, and in the place where the contract is made.

Upon the hypothesis and argument of the plaintiff, the terms " in current bank notes of the city of Cincinnati," are rejected, in the construction of the note, as having neither meaning nor object; for if they import an agreement to pay two thousand dollars in money, the note would have imported the same thing had they 197] been *omitted altogether. It would be a perfect note for the payment of two thousand dollars in money without them. The rules of interpretation do not permit courts so to interpret a written agreement, as to reject any part of it, where it is manifest that the parties contemplated that some operative effect should be given to the terms they employed—and that such was the intention here can not be doubted.

The plaintiff's argument is, that here is a promise to pay two thousand dollars—here is an acknowledgment of value received to that amount. You can neither controvert the amount nor the consideration. You may pay this sum in bank notes at the day, but these notes must be current, of the value of money or coin, and this because the general course of business has given to them the character of money. If this general course of business may be called in to aid the plaintiff in giving an interpretation to these

208

terms, the defendant surely can not be precluded from resorting to it to fix and ascertain their interpretation on his part.

It is urged that the fact of a fictitious and fluctuating medium of exchange being thrown upon the community to circulate at a depreciated value, can not change or alter the law of contracts, or influence the decision of courts. And to this we agree, remarking, nevertheless, that a 'great deal of circumlocution is employed in the plaintiff's argument to express what would have been· more easily, and full as clearly, expressed by the terms " *depreciated currency.*" To make and to avoid definitions is one of the labors of a skillful controversialist. It suits the plaintiff's argument much better to obtain a definition of the terms " current bank notes," from Lord Mansfield, than from the mercantile and business vocabulary of Cincinnati, where the contract was made. But the rules of law require that the terms employed in a contract shall be interpreted in reference to the state of things prevalent in the country where the contract was made.

The fact that a depreciated currency is thrown upon the country, to circulate in the character of money, can not change the law of contracts, every man will admit. But it does not follow that this fact must be excluded from consideration in the interpretation of contracts. On the contrary, we maintain that if any reference be made to this fact in the contract, then it enters into and becomes a part of the contract itself, and must be kept steadily in view in enforcing the execution of the contract.

The promise of the defendant is to pay in current bank notes of *the city of Cincinnati. We maintain that this is an [198 agreement to deliver two thousand dollars, numerically, of bank notes, passing current in trade and business as money. The plaintiff admits that if, on the day the note fell due, two thousand dollars, numerically, of notes of the Bank of Steubenville, had been tendered to him, he was bound to receive them. Such tender would have been a fair and legal offer to perform on the part of the defendant. But had the defendant tendered two thousand dollars, numerically, of the Bank of Cincinnati, the plaintiff would not admit that this tender was a fair offer to perform the contract. Why this distinction ? Because the right to make the tender depended upon the fact whether the bank notes tendered passed currently in Cincinnati. This view of the case demonstrates that

it necessarily involves other considerations than an absolute promise to pay money.

Another view of it may be presented, which places it in a still stronger light. Bank notes are intended to circulate as a fair, equal representative of coin. When they lose this character, they are said to depreciate. Their numerical value is the same, but their real value, in relation to coin or property, is different. This real value, most generally, is fluctuating; and when, in this situation, they constitute the medium of exchange upon which the business of a country is predicated, they still circulate numerically, and the price of property advances or decreases in proportion. In this case, had the notes of the banks of Cincinnati remained in circulation until the note became due, passing currently at their numerical value, while property had so appreciated as that their relative value was as one to four—that is, four numerical paper dollars would sell only for one dollar in coin—would the plaintiff have been bound to accept two thousand numerical paper dollars of the banks of Cincinnati in payment of his debt? His argument is that he would not, because none can be current bank notes but those the numerical and actual value of which are the same. This is the sole ground upon which he can stand, and if it be not tenable—if the court adjudge that the terms " *current* bank notes of the city of Cincinnati " mean bank notes that pass current in business, without regard to their numerical or actual value—then the plaintiff would agree, and, had a tender been made, would insist that the rule did not operate justly.

This contract ought to receive the same interpretation that it would have received had the state of things here suggested actually occurred. The rule laid down for the interpretation of this **199]** contract *must apply to all contracts made in similar circumstances, without reference to the time of performance. If the rule would be unjust that compelled the plaintiff to accept a numerical amount of bank notes, which was less than one-fourth of the value contemplated by the parties, it would certainly be equally unjust to adopt a rule that would compel the defendant to pay double the value at which the subject of the contract was estimated by the parties when the contract was made.

In giving an interpretation to the terms " current bank notes of the city of Cincinnati," the court ought to contemplate the subject

Morris *v.* Edwards.

as they would do had a tender been made in certain bank notes claimed by the defendant to be current within the words of the note, and refused by the plaintiff upon the interpretation he now sets up. It ought not to affect the argument, that on the day this note fell due, no bank notes were current in business but such as were actually and numerically of the same value. The rights of the parties do not depend upon the state of things existing at the time the contract is to be performed, but must be governed and determined by the state of things as they stood at the time the contract was made. These rights ought not to be affected by the fluctuation of the circulating medium, nor by the appreciation or depreciation of property which takes place to meet this fluctuation. At the time the contract was made, the parties compared the property for which the note was given with the then circulation of bank notes current in Cincinnati. It was estimated as equal to two thousand dollars of the numerical amount of these notes, and the plaintiff agreed to receive that sum, numerically, of circulating current bank notes. While this circulation remained afloat and current in Cincinnati, the real relative value of the property and the notes must have remained about the same thing. But the numerical value of the notes, and the estimated value of the property, could not remain in the same proportion to each other. In reference to property, as the real value of the notes decreased, their numerical value increased, and property being estimated by the increased numerical value of the notes, appreciated also. The necessary and inevitable operation of this course of things was, that the notes, in process of time, must cease to have any actual value, and no longer serve as a standard by which to estimate the value of property. When this took place, the notes disappeared entirely, and the fictitious value or estimation which their circulation gave to property, disappeared also. Contracts made during the time when trade and business *were in this situation, ought not to be enforced without re- [200 currence to the actual value of the subjects at the time the contracts were made—more especially where the parties themselves, as in this case, have predicated their contract upon the circumstances of the day, and have so written it down.

The relation which the actual value of current bank notes bore to their numerical value at the time this contract was made, is a matter of fact, which, if it can be ascertained, decides at once the real just rights of the parties.

211

The state of business in Cincinnati in 1819, the place where and the time when the contract was made, is a matter of which the court must take notice without requiring proof. It is a portion of the history of our state, not the less to be regarded because of very recent date. The contract of the parties contains upon its face intrinsic evidence that it was founded upon the condition and state of business then prevalent in that section of the country. What, then, was this state of the country, known from its history, upon which the contract is founded and to which it refers? It was this: all business was transacted upon a circulating medium consisting of bank notes, the numerical value of which was greater than their real value, and that all contracts were based upon the numerical, not the real value of these notes; that there was from time to time a difference between their real and numerical value, which was regarded in the making of contracts, and which can be established by proof so as to be made applicable to contracts entered into at different periods of time.

The promise here being to pay in this description of bank notes, as we interpret it, and the very terms of the promise asserting the nature of the consideration, or rather its character, as being equivalent only to the numerical value of two thousand dollars of or in bank notes such as then constituted the money circulation of Cincinnati, we insist that the only standard by which the plaintiff can measure his damages is the actual value of the notes at the time the contract was made. This standard is fair and just for all parties. It relieves all from the uncertainty of what may be the numerical value of the notes at a future day, and gives to contracts made during these times a certainty and mutuality that no other rule can give.

Parol evidence to prove what was the real value of bank notes current in Cincinnati on the 25th December, 1819, is not offered to explain an ambiguity on the face of the note, nor to prove a consideration different from that expressed upon the face of it. But it 201] *is offered to prove what is the real value of the consideration expressed. And its admission is founded upon the well-known historical fact, that contracts which stipulate upon a value in bank notes are predicated upon a numerical, and not an actual value. Evidence to establish this actual value is received upon the same principle that evidence is admitted to prove the actual value of

two thousand bushels of corn, were a contract made to deliver that quantity of corn, and suit brought upon it.

In the case of the corn, the actual value, at the time it should have been delivered, must be the rule of damages. And the reason is, that the party purchasing must have made his purchase with a view to the value of the article at the time of delivery. This is the general rule. But if the contract stipulated, that upon the delivery the payment should be made in current bank paper, at fifty cents per bushel, and upon the day of delivery the real value of corn was twenty-five cents per bushel, and the real value of current bank paper was fifty cents upon the dollar, a court of justice surely could not say that the paper price to be paid per bushel by the plaintiff, must be deemed the actual specie price against the defendant. And yet the argument of the plaintiff upon this point leads precisely to this conclusion.

The whole argument of the plaintiff proceeds upon the idea that legal and technical rules so operate as to compel the court to shut their eyes to the real facts of the case, and adjudicate in a blindfold state. Current bank notes are regarded in England, or rather were regarded in England seventy years ago, as money. Therefore, current bank notes of the city of Cincinnati, in Ohio, in 1819, are to be understood in all contracts as equivalent to money. The consideration of a promissory note can not be proved to be less than the amount expressed on the face of it (which, by the by, stands upon no principle). Therefore, you shall not ascertain the true value, where it is plain that a numerical, and not a real value is expressed. This appears to me the true state of the plaintiff's argument; and if such be its character, it is surely clear that the premises do not support the conclusions.

If this contract is really to be regarded as an agreement to pay two thousand dollars in money for a property fairly estimated to be worth that in money, by the parties, and the agreement to receive current bank notes, of specie value, instead of insisting upon specie, is inserted as a privilege to the defendant, in making payment, then the plaintiff's argument is well founded. But if this be not *the character of the transaction—if it be such [202 as I insist it is, and that is a fact of which the court are bound to take notice in part, and to receive proof as to the remainder, then the plaintiff's argument is misconceived, and can not avail him.

WADE and HAYWARD, in reply:

It is not contended that bank notes are money, but that, in legal contemplation, they are to be considered and estimated of the same *value*. Lord Mansfield so considered them; and the reason was, be-· cause they passed in *currency*, on a par with *specie*.

The resort to Lord Mansfield for a construction of the terms "current bank notes," arose from *necessity*, and not from a disposition to avoid any other definition which had been given to them by the general consent of mankind, or by the merchants and men of business at Cincinnati. The history of those times, when the paper of the insolvent banks of Cincinnati was permitted to circulate at a depreciated value, does not furnish any definition to these terms. They were not then in general use. "*Bankable money*" was a term in general use, and universally understood at that place, during the whole of that period; and it is expressly denied that any particular definition has ever been given and generally understood, by the men of business and others at Cincinnati, to the terms "current bank notes," or "current bank notes of the city of Cincinnati;" and they have no other meaning, at that place, than such as is given to them by a sound legal construction. And the plaintiff contends and insists, that this contract does *not* "contain upon its face intrinsic evidence that it was founded upon the condition and state of business then prevalent in that section of country."

The defendant is mistaken, when he supposes "the plaintiff's argument proceeds upon the idea, that legal technical rules so operate as to compel the court to shut their eyes to the real facts in the case, and to adjudicate in a blindfold state." The plaintiff contends, his argument is founded upon the well-known and long-established principles of law, and the plainest dictates of reason and common sense; and he urges it upon the court, to prevent injustice and a serious injury to himself.

With what reason can the defendant now insist, that his case is to be adjudicated by the same rules as it would have been had he made a lawful tender of the bank notes described in the note declared on? He is now in a very different situation. Had he made the tender when the note had become due, the plaintiff would *have* **203]** *\*had* an opportunity of obtaining the two thousand dollars, in *specie*, for the notes tendered, and the defendant could not have been charged with a violation of his contract. But the defendant has elected a different course. He retains the "current bank notes"

in his own hands, or obtains the specie for them—suffers himself to be sued on his note, and claims to be discharged on the payment of two-thirds of the sum due, and thereby speculate upon his own contract, and upon that, too, in which he has been guilty of a breach of good faith ! This might all be done, if the doctrine contended for by the defendant should be sanctioned by the court. Whereas, if the defendant had paid the note at the time and in the manner therein stipulated, the plaintiff might have long since realized his two thousand dollars in *specie.* And it is asked, who is entitled to the benefit of obtaining the sum of two thousand dollars in specie, for the pro ceeds of these "current bank notes?" The plaintiff, who has been kept out of his money, or the defendant, who has refused to comply with his engagements? This question is asked, on the supposition that the consideration and promise are considered to be two thousand dollars *of* current bank notes," and that these notes, at the time the payment became due, were circulating at a value below the par of specie. But a different construction must prevail. The contract is an obligation, on the part of the defendant, to pay the plaintiff the sum of two thousand dollars, *in* a particular kind of money, *at a stated time.* He has not done it, and the rule of damages has been fixed by the parties themselves, in the instrument itself. The sum due was liquidated at the time the contract was made, and makes a part of it. The plaintiff, therefore, insists that he is entitled to judgment for the sum of two thousand dollars, with the interest thereon from the first day of February, 1821.

Judge HITCHCOCK:

This case presents two questions to the consideration of the court:

1. Whether the sum of two thousand dollars, mentioned in the contract, with the interest due thereon, shall be recovered?

2. If, in the opinion of the court, this sum can not be recovered, whether the damages are to be ascertained by proof of the value of "current bank notes of the city of Cincinnati," on the day the contract was entered into, or on the day when the payment fell due?

That the first question may be correctly decided, it is necessary to ascertain what character is to be attached to bank notes. If they are considered as money, then this contract is a contract for

215

204]   money; *if not, it is a contract for the payment of a certain sum in specific articles. By the term money, we generally understand that which is the lawful currency of the country—that which may be tendered, and must be received in discharge of a subsisting debt. With this understanding of the term, it can not be contended that bank notes are, in themselves, considered money. They are not a lawful tender. No person is bound to receive them in discharge of a debt, unless in pursuance of a previous contract. But for certain purposes, and in fact for every purpose, in the ordinary transaction of business, bank notes, it is believed, ever have been and still are considered as money. They do not come under the denomination of goods, wares, and merchandise. Evidence of the receipt of bank notes will support an action for money had and received. The delivery and receipt of them, in discharge of a debt, will be considered as payment of so much money, not as accord and satisfaction. By the universal consent of mankind, when they pass from one to another, they pass as money. In the course of business, they are charged and credited as cash, as money. They have been estimated as money, not only by men of business, but by courts of justice. Lord Mansfield, in speaking of bank notes, says, " They are not esteemed as goods, securities, nor documents of debt; but are located as money, as cash in the ordinary course and transaction of business, by the general consent of mankind; which gives them the credit and currency of money to all intents and purposes." "They pass by a will which bequeaths all the testator's money or cash, and are never considered as securities for money, but as money itself." 1 Bur. 457. The Supreme Court of the State of New York say that bank notes are considered as money—that a note for a certain sum payable in bank paper is a note for money, and of course a promissory note within their statute. 9 Johns. This court, in the case of Smith v. Housten, submitted in Licking county, in the year 1820, in giving a construction to the "act to prohibit the issuing and circulating of unauthorized bank paper," after a consultation of all the judges, decided that bank notes must be considered as money. 14 Stat. 10. The statute law of this state, entitled "an act making certain instruments of writing negotiable," provides, "that all bonds, promissory notes, bills of exchange, foreign and inland, drawn for any sum or sums of money certain, and made payable to any person or order," etc., shall be negotiable

Morris v. Edwards.

by indorsement thereon, etc. Vol. 18, p. 163. In giving a construction to this statute, we hold that a note drawn for a sum certain, payable in bank paper, *is negotiable. This opinion can [205 be justified upon no other ground than by considering bank notes as money.

Apply these principles to the case under consideration, and what will be the result? Edwards, for a valuable consideration, promises to pay Morris or order, on a certain day, two thousand dollars, with interest annually. The payment is to be made "in current bank notes of the city of Cincinnati." Such are the terms of the contract. When the day of payment arrives, there is no offer to pay—there is no tender of bank notes. Had the note been transferred, by indorsement, to a third person, that third person, as indorsee, might have maintained an action against Edwards as maker of a promissory note. We should not have hesitated to render a judgment in favor of the indorsee. And why? Because the note would have been considered as a note for money. If it be a note for money, as I think it must be considered both upon principle and authority, there can, I apprehend, be no doubt that the plaintiff' is entitled to a judgment for the full amount of two thousand dollars, with the interest.

But suppose we take another view of the case, and consider bank notes, not as money, but as specific articles—will this lead to a different conclusion? Or will the plaintiff be compelled to receive a sum less than that named in the note? Where a contract is entered into for the payment of one hundred bushels of wheat, at a certain time, and the wheat is not delivered, the rule of damages will be the value of the wheat when it should have been delivered. If, however, the contract be for the payment of one hundred dollars, in wheat, or of one hundred bushels of wheat at one dollar per bushel, and payment be not made, it will not be doubted but that a plaintiff, seeking to recover damages upon such contract for its violation, would be entitled to one hundred dollars. It would at once be said that the damages were liquidated or agreed upon by the parties. In the case under consideration, Edwards promises to pay two thousand dollars "in current bank notes of the city of Cincinnati." This promise is not performed—the bank notes are not paid. What must be the rule of damages? I would suppose, if bank notes are considered in the same light, and as possessing the same character as other specific articles, we

must say at once, that the parties had fixed the rule of damages, and that the plaintiff must recover the amount named in the contract. I am sensible that it has been urged in argument, that in the contract under consideration, the word *in* must be interpreted **206]** to mean *of*, and that this contract should \*be considered the same as if it had been for the payment of two thousand dollars *of* current bank notes. Is there anything, however, in the contract itself that would justify this interpretation, or justify the court in changing the meaning of words? It appears to me that there is not, unless we attach a character to bank notes different, in some respects at least, from that which we attach to specific articles.

Counsel for the defendant insist, that whether we consider bank notes as money, and this contract a money contract, or whether we consider it as a contract for a certain sum payable in specific articles, injustice is done to him, inasmuch as such could not have been the intention of the contracting parties. In interpreting contracts, the great object always is to arrive at the intention; and if in giving the construction to the contract, before the court, which I am disposed to give, injustice is done to either party, I sincerely regret it. The law, however, has fixed and established certain rules, by which all contracts are to be interpreted; and it would be dangerous to depart from these rules to accommodate a particular case or class of cases. No principle can be better settled than this, that in the interpretation of contracts, the words or terms made use of, taken in connection with the subject matter, are the only things which can be looked to. You shall collect the meaning of parties by their words; every contract must be interpreted by itself. Resort can not be had to parol or extrinsic evidence, except where there is an ambiguity not apparent upon the face of the contract. If there is an apparent ambiguity, even this can not be explained. The contract before the court is very explicit. If the parties had intended this as a promise to pay two thousand dollars of bank notes numerically, it could have been easily expressed. If they intended that, in the event of the failure of the defendant to pay the bank notes, he should be discharged by the payment of a less sum in money or specie, this intention could with equal ease have been expressed. As neither is expressed, I must infer that such was not the intention, and am of opinion that parol evidence can not be received by way of explanation to lead to a different conclusion. In fact, the effect of such

testimony, if received, would not be to explain this contract, but to prove one materially variant in its terms and conditions. Counsel for the defendant do not deny that it would be improper to receive this species of evidence.

It is contended, however, that this contract was predicated upon a particular state of business in the country where it was made, to *which the terms of the note refer, and that the amount [207 which the defendant is bound to pay must be determined by giving to the terms used in the note an interpretation connected with the history of the times in which it was made.

The contract was made in Cincinnati, and bears date in the year 1819. It is said, in substance, that in the course of that year the paper of the banks of that place had depreciated—that there was a difference between its real and numerical value—that this depreciated paper was the principal circulating medium of exchange—that it was in common parlance denominated " currency," or " current bank paper," to distinguish it from that description of bank paper whose real and numerical value was the same—that the term " current," which, when applied to money, has been understood to mean that which is lawful, and when applied to bank paper that which is equal to specie, was here understood to mean paper which was depreciated—that contracts similar to this were made with the understanding that they should be discharged with this depreciated paper, which is denominated *currency,* or in specie of equivalent value, and in fact that the character of bank notes was changed ; that they were no longer considered as money, but similar to any other specific article, and that a promise to pay two thousand dollars *in* this kind of property or paper, was understood to be a promise to pay that amount of it according to its numerical value. And it is further contended, that the court are bound to know these facts as matters of public history, and apply them in the construction of the contract under consideration. The argument raised upon this state of facts is entitled to great consideration, and if the case was a new one would undoubtedly have much influence. But before we adopt the principle contended for, it may be well to examine a little as to consequences. These facts can not be proved by parol, because they would lead to a construction of the contract different from what its terms justify ; yet the court are bound to know them as matters of public history. Public history, not of the state at large, but of a particular town or

city. It is to be recollected that contracts similar to the one before the court have been frequently made in this state, especially since the year 1812. Makers of notes have promised to pay certain sums "in-current bank notes," in "eastern or western bank notes or paper," in the notes of a particular bank or of the banks of a particular place. Almost every variety of expression has been adopted that could be thought of. This mode of transacting business grew out of the state of the circulating medium, and was 208] adopted *sometimes for the accommodation of the creditor, but more generally for the accommodation of the debtor. These promises have not always been complied with, and suits have been brought to compel judgment. Judgments have been recovered and enforced by execution. This court have in cases of default without hesitation assessed the damages without the intervention of a jury, and in every instance previous to the year 1822 it is believed the rule of damages has been the sum named in the contract, together with the interest. This has been the practice, not in one particular county, but throughout the state. So far as a uniform course of decisions, when any particular subject can settle the law upon that subject, it would seem that the rule of law, or the law itself, applicable to this subject, was well settled. It must be recollected, also, that this court, in giving construction to contracts, can not interpret the same terms, or words made use of in contracts, to mean one thing in one part of the state and a different thing in another. The rule of law must be uniform with the whole body of the people. The same words used in a grant would convey an estate of inheritance in the county of Trumbull or Hamilton; and it will be contended that if by general consent the inhabitants of the county of Trumbull should attach a meaning to those terms which in a grant convey an estate of inheritance, different from that which the law attaches, that the court would be justified in changing the interpretation of those terms to meet the feelings, wishes, or general consent of the people in that particular section of country. In interpreting contracts, the law of the place where the contract is made is to govern. But in what does the law of Cincinnati and its vicinity differ from the law in Cleveland or Steubenville? Previous to the year 1819 it is not contended that there was any difference as to the principles applicable to the cases similar to the one before the court. We are called upon, however, to know certain facts which have transpired since that period, as

matters of public history which must go to change these principles in that particular section of country, so that a rule of law is to prevail different from that which prevails in other parts of the state. If this be correct, may not the same innovation be made by every town or village in the state; and may we not be left in this predicament, that agreements containing precisely the same terms, and relating to the same subject matter, must be construed to mean different things, according to the understanding of the people in the various counties, or even towns, in which they shall be executed? It does appear to me that this is carrying the rule that *the *lex loci* must govern to an unreasonable length. [209 True, the citizens of Cincinnati, as well as the citizens of any other incorporated town or village, may, according to their acts of incorporation, establish rules for their own internal regulations; but can they contravene the general law of the land—can they change the law of contracts?

As was before observed, if this were a new case, and of the first impression, the argument of the defendant would undoubtedly have great weight. But I conceive that the law on the subject has been long settled; that the rules for the interpretation of this species of contract were well understood previous to the year 1819; and that the circumstance that a fictitious medium of exchange was then thrown upon a particular section of our country can not change these rules. It is better that a temporary or partial inconvenience should be sustained, than that the general and well-established principles of law should be violated or even changed.

But we may well inquire whether these facts constitute such matters of history that courts are bound to take notice of them. Certain facts, which are properly matters of history, have been long since transacted, and of which no person can give testimony, may be proved by ancient history of the times in which they were transacted. Neale *v.* Fry, cited Salkeld, 281. But a particular custom can not be thus proved. The reason why public history is admitted as evidence seems to be, that the facts necessary to be established are properly subjects of history, and because of the extreme difficulty or utter impossibility of establishing those facts by any other testimony. But the facts which the court are called upon to know in the present case are such as have recently transpired, and must be in the knowledge of those persons who were in business at the time.

It is urged in argument, that if in the present case we allow the plaintiff to recover any more than the specific value of two thousand dollars of depreciated bank paper, at the time the contract was made, injustice will be done, because he will receive a greater value than the consideration which he gave. This argument is raised upon the supposition that property at the time was estimated to be worth a greater nominal amount, in proportion as the paper of the banks had depreciated. But if this consideration is to influence the court, the argument may be urged with equal force, in estimating the damages in another class of contracts. *Property contracts* are as well known and understood in different parts of the state as *currency contracts* can be in any particular section. The owner of any specific article of property is willing to sell that
210]    property for a certain *sum in money, or he will sell it for a sum twenty-five or thirty per cent. greater, and receive his pay in property of the same or a different description. The purchaser, consulting what he conceives to be his interest, agrees to take the property offered for sale, at the advanced price, and pay in specific articles. The bargain is completed, and the vendee contracts to pay the vendor a certain sum in these specific articles. This contract is not complied with. The articles are not delivered, nor even tendered, at the time when due. Suit is commenced and judgment recovered. The damages uniformly assessed are the amount specified in the contract, without reference to the specific or money value of the property transferred, which was the consideration of the contract. The defendant is compelled to pay twenty-five or thirty per cent. more than the amount for which he could in the first instance have obtained the property which he purchased. Is not his case hard? Yet he can obtain no relief. If he complains he will be told: "You might have contracted differently; if it was understood that in the event of your failure to deliver the specific articles you were to pay a less sum in money, it should have been so expressed; as it is not, you have by your contract agreed upon the amount you must pay. True, you had your election to pay this amount in property; but as you have not complied with your contract, you must pay it in money."

If these principles are correct when applied to *property contracts*, they must be equally so when applied to *currency contracts*. The loss which a defendant in either case sustains is not attributable to the plaintiff; it is not attributable to the law, but to his own

Morris *v.* Edwards.

neglect, to his carelessness in not performing, or perhaps, in some instances, to his misfortune in not being able to perform his engagements. Upon the whole, whether I consider the note in suit as a note for money, on the principle that bank notes have been and still are considered as money, or whether I consider it a note for a certain sum, payable in specific articles, I must come to this conclusion, that the plaintiff is entitled to judgment for the amount named in the note, together with the interest which remains unpaid.

Entertaining this opinion, it seems unnecessary to examine the second question raised in the case, that is, whether, admitting that the plaintiff is not entitled to recover the full amount of two thousand dollars, but merely the specific value of two thousand dollars of "current bank paper of the city of Cincinnati," the damages shall be ascertained by proof of the value of that paper when the contract was made, or when the payment became due. If the same character *is attached to bank notes as is attached to [211 other specific articles, the same rules of law must be applied in interpreting a contract which by its terms is to be discharged by the payment of this paper, as if it were to be discharged by the delivery of any other article of property. It will not do to treat it as money for one purpose and as property of a different description for another. In cases of contracts for the delivery of specific articles, one hundred bushels of wheat, for instance, to be delivered on a certain day, the law has said that the rule of damages shall be, not the value of the wheat on the day the contract was made, but on the day the wheat should have been delivered. If bank notes are considered as specific property, why should not the same rule be applied as to them? I am aware that it is said, when property is sold and payment is to be made in bank notes, either at the time of sale or at a future day, reference will be had to the value of those notes on the day of sale, and not to the value which may be attached to them at a future period. This is undoubtedly true, but the same reference is had to the value of wheat, or of any other specific article, at the time of contracting, provided the payment is to be made in wheat or such other specific articles. It is, however, to the contracting parties that the value of the article may be increased or diminished, and they contract possessing this knowledge. Still no change of value in the property can change the rule of damages, and if it were necessary in the present case to

223

express an opinion on this question, I should say that the value of the " current bank notes " named in the contract, or on the day of payment, must be the rule by which a court would be governed in assessing damages.

Judge PEASE:

I concur generally in the opinion expressed by Judge Hitchcock. But the case may be viewed in two aspects in which it is not presented, both of which I conceive of some importance.

Although the bank notes that formed, at one time, the circulating medium of Cincinnati and other sections of the state were *depreciated* in *market*, the *legal obligation*, on the part of the banks that issued them, to pay their full numerical value, *was not depreciated.* In this respect the case differs materially from a contract to pay or deliver other articles of personal property. When such is the contract the party who is to receive the property, if he receive it, can get no more for it in money than it will bring in market; and when not delivered, if he bring a suit he can recover 212]  a judgment for no *greater sum than its market value at the time it should have been delivered. This market value is the rule of damages. Where the creditor receives of his debtor bank notes, he need not, unless he prefers it, resort to their market value for any purpose. He is not obliged to accept of law or of justice as either may be dealt out to him at a broker's shop. He may resort to a court of justice, and there he can obtain judgment against the bank that issued the notes, for their numerical amount, without regard to their *market* value. The ability of the bank to pay has nothing to do with the sum for which judgment must be rendered.

*Market price* is a proper rule of damages in those cases where, if the article be received, it can, by no possible means, be converted into money, except through the medium of the market. But where the law will convert it into a judgment for a certain amount, that amount ought to be the rule of damages, when the article is not delivered. The *market price* has no bearing on the subject. The sum specified on the face of the notes determines the amount for which judgment must be rendered against the bank.

There is, I conceive, no analogy between the case of depreciated bank notes and the depreciated continental currency. The conti-.

nental bills were issued by the government, against which payment could not be coerced by judicial process. An effective judgment could not be obtained against any one for their numerical value. In this respect there is a strong and marked distinction between the two cases. But this is not all.

In some, if not in all the states, the continental bills were made by law a legal tender in payment of debts, and in discharge of contracts. When these laws were repealed, the debtors were deprived of the means of paying their debts in a currency which was abundant, and which was legal and current for all purposes when the debts were contracted. These contracts might be considered as made upon the faith reposed in the public law, that they could be discharged in continental bills; and when the right to do this was taken away by law, a strong case was presented for originating some equitable mode of affording relief to the debtor and doing justice to all parties. Yet I know of no case where the courts interfered upon general principles. It was not until legislative recommendations, or positive laws, suggested a course, that a scale of depreciation was adopted.

Our laws never made bank notes a legal tender, and have never changed their legal character. The debtors have no such thing to *complain of. They know the hazard in speculating, with  [213 the intention of making payment in depreciated bank notes. If the course of events, or their own negligence, in not complying with their contracts, has made their speculation a bad one, their case, in the view of justice, calls for no extraordinary interference of the courts to aid them at the expense of the creditor.

Judge SHERMAN concurred.


Judge BURNET dissented:

As I can not concur in the opinion of the court, given in this case, I will state my own view of the subject which will show the reasons of my dissent.

The action is brought on a promissory note, dated December 25, 1819, in the following words: "On the first day of February, in the year 1822, I promise to pay James C. Morris, or order, *in current bank notes of the city of Cincinnati*, two thousand dollars, with interest payable annually, for value received." By an indorse-

ment on the note, it appears that the interest has been paid till the first of February, 1821.

The defendant proposes to prove that at the time this note was given, and when it became payable, the notes of all the banks of the city of Cincinnati were depreciated in value, and were received at a discount in exchange for specie, or in payment of specie debts; and that it was the intention of the parties, inferable from the common use and practice of the neighborhood, in similar cases, and from the circumstances attending this particular case, as well as from the import of the words used in the contract, that the plaintiff should receive the *nominal* sum stated in the note, in the depreciated currency described, or the specie value of so much of that currency. He also proposes to prove that the note was given for a part of the consideration of a tract of land, and that it was the universal custom of the Miami country, at that time, in all contracts of a similar nature, to stipulate for a price, in reference to the value of current paper; and where the purchaser would agree to pay in specie, that a deduction was always made from the price, equal to the depreciation of the paper, and that this particular contract was made in reference to, and in conformity with, that custom; that the actual value of currency, at the date of these contracts, was generally referred to, and not its probable value when the payment might become due; and that, at the date of this note, the depreciation of current bank notes of the city of Cincinnati, was thirty-three and one-third per cent.

214] *The plaintiff objects to the whole of this testimony. He insists that " the legal effect of the note is to pay the sum of two thousand specie dollars, with interest; that the expression ' current bank notes of the city of Cincinnati,' in legal import, means the notes of such banks as pay their notes in specie, on demand, and not those that circulate at a depreciated value." It is also contended that there is not such a latent ambiguity in this note, as requires any parol proof, or other evidence, to explain or ascertain its true meaning; that if any ambiguity does exist, it is a patent one, and must receive a construction, exclusively, from the language made use of in the instrument.

The reverse of these propositions is insisted on by the defendant, who contends that the recovery ought not to be for the full amount of the note in specie, but for an amount to be ascertained by a reference to the value of " current bank notes of the city of

Cincinnati," either at the date of the note, or on the day on which it became payable.

It is difficult to ascertain by what course of reasoning a promise to pay bank notes of a particular description, can have the legal effect of a promise to pay specie. With equal propriety it might be contended that an engagement to deliver flour, was, in law, a promise to pay specie; for, in either case, if the thing contracted for be not delivered or paid, and a recovery be had on the contract, the judgment must be rendered for specie, and not for the specific article. It does not, however, follow that the plaintiff has a right to demand specie, or that the defendant is bound to pay it. The reverse of the proposition is true; such a right or such a liability does not exist. The legal effect of a promise (in the sense in which the plaintiff uses that phrase), is the liability created by it, or that which the party to whom it is made has a right to demand. In this case, the promise is for bank notes— the right of the plaintiff is to demand bank notes, and the legal effect of the promise must be to pay or deliver them.

It is equally difficult to see the correctness of the construction given to the expression *current bank notes of the city of Cincinnati.* The description given of them does not present the idea of their being paid, on demand, in specie. The contract is silent on that head, and to supply the omission would materially change its obligation; it would require the defendant to do that which the terms of his contract do not embrace. The description contains but two requisites—the notes must be current, and of the banks of the city *of Cincinnati. Notes are current when they pass freely in    [215 the common transactions of business, either at their par value or at any other value, ascribed to them by common consent; and if they so pass they are current, whatever may be their value in reference to a specie standard, or whatever may be the manner in which the banks redeem them.

If the paper of one bank passes freely at its face, or at par, and the paper of another passes as freely at a discount of ten or twenty per cent., they are in fact equally current, though not of equal value; and it may happen that a majority of the community would prefer the depreciated paper to that which is passing at par; and a difference may exist, in reference to this quality, in favor of those that pass at a discount—they may be the most current. It can not be admitted that the contract calls for such notes as were redeemed

in specie on demand, unless it be taken for granted that at the date of the contract the notes of no bank in the city, which were not redeemed in specie on demand, were current; but with this admission, it would be true, not because the notes were so redeemed, but because no other description of notes, were current. The fact, however, was otherwise. The notes of all the banks of the city were depreciated, and none of them were paid in specie on demand. It would, therefore, follow, from the plaintiff's construction, that there were no bank notes in existence of the description called for, and that it was impossible to perform the contract. In support of this construction, it seems to be taken for granted that the term *current* has a reference to the value of the paper, when, in fact, it relates only to the manner in which it circulates. Depreciated paper may circulate freely at its value, and pass as currently as any other, and if it does, it answers the requirements of the contract, which the court can not extend by requiring anything not included within the terms of it. If we can say the notes shall not only be current, but current at par, we may require them to be current at a premium or advance.

It is further contended that if any ambiguity exists on the face of the note it is patent, and must be explained exclusively by the language used in the instrument.

The defendant does not allege that the contract is ambiguous, nor is it necessary for him to do so; the words " current bank notes of the city of Cincinnati," are as expressive of their own meaning as " barrels of superfine flour," or "bushels of wheat;" they are definite and admit of but one construction. They necessarily include the **216]** *notes of every bank of the city that were passing freely in the common business of the day, and they exclude notes of every other description. No other interpretation can be given to the terms, nor is parol testimony necessary to explain them—they speak their own meaning. It is true that the value of those notes has not been uniform, and it is a question of fact to be decided by testimony what was their value at any particular period, but this does not arise from any ambiguity apparent on the contract, but from matter wholly extrinsic. If a contract were made for a hundred barrels of flour, or a thousand bushels of wheat, it could not be said to be ambiguous, although in an action for non-delivery it would be necessary to prove the value of the article, for which purpose parol testimony would be received without objection. This is our daily

Morris v. Edwards.

practice; and there does not appear to be more difficulty or impropriety in proving the value of a bank note than of a barrel of flour. The one is worth what it will command in market, the other is worth what it passes for by common consent.

The objection to parol testimony in this case, on the supposition that it is an attempt partially to affect the consideration of the note, is more specious than solid. It is not an attempt to reduce the amount of the demand, by showing that it is greater than the value of the consideration received, but to show the real demand, which is the value of the thing demandable, in order to ascertain what sum may be recovered for the non-delivery of it. If a reference should be had to the consideration, it would not be for the purpose of reducing the demand, but of showing what it originally was; it would be presumptive testimony of the value of the paper at the time of the contract.

If A. be possessed of property that he values at six hundred dollars in specie, and proposes to sell it either at that price in specie, or at nine hundred dollars in currency, which is estimated to be of the same value, and B. makes the purchase and gives his note for nine hundred dollars in current bank notes, and it becomes a question how much specie A. ought to receive for the non-payment of the bank notes, B. may prove these facts for the purpose of showing the value of the notes which was the true consideration of the purchase, and the real sum intended to be paid.

It will be admitted that all contracts are to be construed agreeably to the understanding and intention of the parties, to be collected from their language. The language of the note before us seems to be clear and intelligible; it is a promise to pay a given sum *in a particular description of currency, and it binds [217 the defendant to pay as much of that currency as will, at the face of it, amount to the sum required, which was two thousand dollars. A tender, therefore, of that amount of the current bank notes of the city of Cincinnati would have been good, whatever may have been the value of those notes compared with specie.

When a contract is made to pay a given sum in bank notes, it obligates the party to pay as many of those notes as at the face of them will amount to the sum required, without reference to their value. There is, therefore, a difference between a promise to pay a given sum in produce, and a promise to pay it in bank notes; in the one case the quantity of produce is indefinite and must depend

on its value, which is fixed and certain ; in the other, the amount is fixed and is ascertained by the sums impressed on the face of the notes, but their value is uncertain. The case before us has a strong resemblance to a contract for the delivery of a certain quantity of produce, as a hundred barrels of flour or a thousand bushels of wheat, in which case, if the property be not delivered, the rule of damage is its cash value; for the same reason the rule of damage in this case ought to be the specie value of the notes. As in the former case, judgment can not be given for the property, but is given for the value, so in this case we can not give judgment for the bank notes, but must give it for their value, to be ascertained as in other cases.

But if this construction does not clearly result from the terms of the note—if any ambiguity is found to exist, it is a latent one, and the difficulty will vanish, and the intention of the parties become manifest by a reference to the nature and value of current bank notes, at the date of the contract, and to the general custom and understanding of the country in relation to contracts payable in such notes.

The notes of chartered banks were issued by legal authority. Each note had its amount, or the sum for which it was issued and passed, impressed on its face, and when any given sum of bank notes was spoken of, as for example a hundred dollars, the expression had a fixed, definite meaning, which was uniform and universal. Everybody who heard it understood it to mean so many notes as would amount to one hundred dollars, each note being counted at the sum, or the number of dollars impressed on its face, and it may safely be affirmed that no other meaning was ever affixed to a promise couched in such language. These facts form a part of the general history of the country. It is also a matter of history that in 1819, and for a 218] *long time before and after, specie was out of circulation, and that current bank notes were the circulating medium of the country, notwithstanding they were much depreciated below the value of specie. Property of every description had risen considerably in value, but had risen still more in price in consequence of the quantity and depreciated quality of the circulating medium. Everything offered for sale was offered at a price fixed on by a reference to the value of bank paper, and whenever an offer was made to pay in specie, which rarely happened, a discount was made proportionate to the estimated depreciation. This practice was universal, and

Morris *v.* Edwards.

continued till efforts were made to put down the paper, when it became common to set a specie and a currency price, and to offer the purchaser his choice, which practice continued till by common consent specie prices were generally fixed; this, however, did not take place till long after the date of the contract before us. When that was made, depreciated currency was the circulating medium, and the price of everything was regulated and fixed with a reference to its value, which was known to be far below that of specie. Hence it is that the defendant in this case has promised to pay in current bank paper; if he had undertaken to pay in specie it would have been so expressed, and the amount of the note would have been proportionably reduced. It must, therefore, have been the understanding of the parties that two thousand dollars in current bank notes, without reference to their value, should be paid, and not the value of two thousand specie dollars in current paper, as is contended for by the counsel. The common usage and universal understanding of the country condemn this construction; not a solitary case can be cited in which it has prevailed. If this were not the case, why were these words inserted in the note? Why was it not drawn generally without designating currency? It undoubtedly would have been so drawn if the plaintiff's construction were correct. The court can not alter contracts, or give them a construction contrary to the legal and manifest intent of the parties. Such a power is denied to the legislatures of the states, and ought not to be possessed by any tribunal.

In this case the defendant has promised to pay a certain amount of current bank paper, which he has not done. By the law of contracts he is liable to render the value of that paper and nothing more; but we are called upon to say that he shall pay as many dollars in specie as he has bound himself to pay in paper, without inquiring into its value. This would certainly be changing the nature and *obligation of the contract. We might with the [219 same propriety say that a person who has promised two thousand bushels of wheat shall pay two thousand dollars, without reference to the value of wheat. At the date of this contract there was about the same difference between the value of a paper and a specie dollar as between a bushel of wheat and a specie dollar.

There appears to be a strong analogy between this contract and contracts which were made during the revolutionary war, when continental money was in circulation, on which the rule of decision

seems to have been, that the plaintiff should recover the value of the currency, agreeably to the scale of depreciation at the date of the contract. The principal distinction seems to be, that in the one case the depreciation was fixed by law, while in the other it depended on public opinion. In the case of Wheaton v. Morris, 1 Dall. 124, the contract was on a sale of tobacco, in March, 1777, when the scale of depreciation was at the rate of five for one. The bond was in the penal sum of twelve thousand pounds, *lawful current money of Pennsylvania*, payable in September, 1782, when continental money had sunk and was out of circulation, and the only current money of the state was gold and silver. No payment or tender had been made. The only evidence given was the contract—the bond, the price of tobacco, and that one of the defendants had offered to pay the value of the tobacco and interest. The court charged the jury, that lawful current money, when the contract was made, was the money emitted under the authority of Congress; that the bond should be taken, as relating to that species of money, and left it to them, on an equitable and conscientious interpretation of the agreement, to reduce the sum, according to the scale of depreciation, or to find the specie value of the property, with interest from the day of sale.

From the short note of Lee v. Beddes, 1 Dall. 175, it appears that the same principle was there recognized, that current lawful money meant such money as was current at the time of the contract, which in that case was continental money, and the court refused to receive testimony to prove that other money was intended.

In the case of Bond v. Haas, 2 Dall. 133, the contract was for the payment of two hundred and fifty pounds, current money of Pennsylvania, dated in August, 1777, payable in one year. At the date of the contract continental money was depreciated, and was at three for one. The plaintiff insisted that the whole sum should be paid in specie, and offered parol proof that such was the understanding of the parties. The testimony was rejected on the 220] ground that it *did not explain the contract, but would be in effect altering it, and increasing the value of the money. It seems to follow as a corollary from this case, that if a contract calls for current money, and it is ascertained that the words "current money" meant current bank notes, the contract is to be discharged in those notes; and in an action for non-payment, the

plaintiff can only recover their value; but if the promise, instead of being couched in words which are understood to mean current bank notes, expressly calls for them by name, the rule of decision must be much more applicable. It seems also to follow, that if a promise be to pay a given sum, in a particular currency, and that currency be depreciated at the time, proof can not be received that the whole sum was to be paid in specie, or currency not depreciated, because such proof would be, in effect, altering the contract and increasing the value of the money, by requiring something of greater value than that which was stipulated. In short, it follows that the true measure of damage, in all such cases, is the value of the notes or currency mentioned in the contract.

In the case of McMinns v. Owens, 2 Dall. 173, the covenant was dated in January, 1779, and required the defendant to pay two hundred and fifty pounds immediately, and two hundred and fifty pounds in annual installments. The contract contained no description of the kind of money. The principal question was, whether it should be reduced by the scale of depreciation, or paid in gold and silver. The court admitted testimony to prove that at the time of the contract it was agreed that the installments should be paid in whatever money was current, at the time they became due, on the ground that as there were two kinds of money in circulation (paper and specie), and the parties had not distinguished which they meant, there was a latent ambiguity. They distinguished it from the former cases, in which the contracts specified current money, which was understood to be paper money.

The doctrine established by this case is, that if a contract be for a given sum, without describing the kind of money or currency, and there are two or more kinds of money or currency, varying in value, either party may prove which was intended; but if the contract designates the currency, such evidence is inadmissible, because the plaintiff must receive the kind of money or currency designated, or its value.

In Kaef v. Whitmer, cited by Shippen, Justice, the cause was sent to auditors, after a judgment by default, to ascertain the value or kind of money. Such a course would not have been pursued, if *the court had recognized the rule which is set up [221 in this case, because whether the currency was described or not, or whatever might have been its value, judgment would have been

233

given for the sum named in the contract, which must have super-seded the necessity of such a reference; but as the reference was made, the inference is irresistible that the amount of the recovery depended on the kind and value of the currency stated in the contract.

In Pleasants *v.* Pemberton, 2 Dall. 196, a receipt had been given in evidence for four thousand continental dollars, dated February, 1780, while continental money was a tender, but depreciated fifty for one. Parol proof was offered, that at the time of payment it had been agreed that the value of continental money should be adjusted afterward, and credit given accordingly. The testimony was opposed on the ground that it went to invalidate the receipt, and add to it a condition which would take off forty-nine fiftieths of its operation. The chief justice admitted the testimony, observing that it did not contradict the writing, or deny anything contained in it, although it reduced the credit from four thousand dollars, the nominal sum mentioned in the receipt, to about eighty dollars, the true value of that sum.

It is true that in these cases the recovery was graduated by a scale of depreciation established by the legislature, which the court was bound to observe; but that fact does not alter the principle or affect the equity of the rule. The only difference produced by it is that in those cases a rule of damage or of recovery was fixed by statute for the government of every case, which here is to be ascertained by testimony, under the direction of the court, in each particular case. The legislature of Pennsylvania did not establish a scale of depreciation, because it was necessary to enable their courts to construe contracts according to the intention of the parties, and to determine the meaning of terms by the usage of the country, but for the purpose of producing uniformity throughout the state. If no such law had been passed, the courts would have adopted the same rule of evidence and a similar standard of damage, and would have resorted to parol proof of the usage of the neighborhood, in place of the scale of depreciation. The statute, therefore, merely anticipated the courts, by providing a uniform rule, which was varied from time to time, and which dispensed with the necessity of parol proof. Nor should it be forgotten that the money in question was issued by Congress, and received its sanction from them, not from the state. The legislature, therefore, could not exercise any *power, in relation

Morris *v.* Edwards.

to its value, in the construction of contracts, that the courts could not have done without their sanction. This conclusion will be manifest from a careful attention to the cases of McMinns *v.* Owens, and Wheaton *v.* Morris, before cited. In the former the contract contained no description of money, and therefore did not point to the scale of depreciation, and yet parol testimony was admitted to show the understanding of the parties. In the latter case the court authorized the jury to lay aside the scale of depreciation, and find the value of the property at the time of the contract, which the statute did not authorize, and which can only be justified on common law principles.

But whether the case before us be considered on precedent or on principle, we are brought to the same conclusion. It is manifest that the claim to the extent set up is against conscience, and, if sustained, will be a palpable fraud on the defendant. Assumpsit is an equitable action. It is declared by Lord Mansfield to be as broad as a bill in chancery; and it is said to be a general description of all cases in which it lies, that the defendant is bound by the ties of natural justice and equity to render what the plaintiff has a legal right to demand. Great latitude is therefore given to defendants, who are permitted to avail themselves of everything which shows that the plaintiff, *ex æquo et bono*, is not entitled to the whole of his demand, or any part of it. Although this doctrine might have been applied, by Lord Mansfield, most strongly to his favorite count for money had and received, yet a large portion of the same liberality is applied to the action of assumpsit generally, and especially if there be a money count to which, as in this case, all the plaintiff's testimony may be applied.

It is believed no person will contend that, on equitable principles, a party should recover more than he asked or expected by his contract, or more than he knew the defendant calculated to pay or intended to promise. Equity and good conscience forbid such recoveries, but they can not be avoided, if testimony like that now in question be rejected, and the plaintiff's construction of the note prevail.

On no principle of equity or common honesty can a man receive that which was never claimed or expected by him, or intended to be promised to him; and every sound maxim in morals, and every just conclusion of reason, which constitute the essence both of equity and law, justify any safe course calculated to pre-

235

Morris *v.* Edwards.

vent such unrighteous results. The plaintiff shows a promise for
223] two thousand dollars of *current bank notes of Cincinnati,
and demands for them the same sum in specie. It is matter of
public history, known to the court, the parties, and the community at large, that these notes, when promised, were greatly
depreciated, and if the allegations of the defendant be true (and
for the purpose of deciding on the admissibility of the evidence
we must presume them true), the demand is for six or seven hundred dollars more than the value of the bank notes, or of the
property for which they were to be paid. The defendant contends that he ought not to pay more than the value of the notes
promised, and, to protect himself against a further claim, offers to
prove these facts, and also what was the understanding of the
parties and the real design of the contract, or, in other words,
how much in equity and good conscience the plaintiff ought to recover.

The authority of adjudged cases, as far as they are applicable,
seem to favor the admission of the testimony. They allow proof
of the intention of the parties, when it does not change or contradict the contract. They permit parol testimony to explain latent
ambiguities, and to prove the value of articles, for the non-delivery
of which damages are sought.

It appears to me that the main question, in this case, is one
that is recognized in the practice of almost every term. When
stripped of the apparent novelty and mystery that has been thrown
about it, it resolves itself into this simple inquiry: May the parties
resort to the common understanding and practice of the neighborhood or state in which a contract is made, to ascertain the correct
meaning of any particular phrase about which they differ, and may
the history of that district or state be referred to for the same
purpose? This, in substance, is what the defendant claims. A
promise is made to pay a given amount in a particular description
of depreciated paper. The parties differ as to the legal import, or
(what is the same thing) as to the true meaning of the terms they
have used, and as one mean of solving the difficulty, it is proposed
to resort to the general practice and understanding of those who
have been in the constant habit of making similar contracts in the
same neighborhood.

The case of Kimball *v.* Noble, decided in this court, was on an
engagement to transport certain property from New Orleans to

236

Morris v. Edwards.

Cincinnati, and to deliver it in good order, *the dangers of the river only excepted.* The boat on her passage took fire accidentally, and was consumed with her cargo. The court having determined that the common law, in relation to carriers, which renders them liable for *all losses not occasioned by the act of God, or the [224 public enemy, had not been adopted in this state, permitted the defendant to prove, what was generally understood among those engaged in the river trade, by the phrase *dangers of the river*, and on the explanation given by the witnesses the defendant had a verdict.

"When words used in a contract have different significations in different places, they will take effect as they are understood where they are spoken." 1 Pow. on Cont. 376. And in the same book, 407, "If money is to be paid by reason of a contract, the terms shall be understood and accepted according to their import, where it is to be received; that is, it shall be paid in currency there." In 1 Forb. 419, "Words should be expounded fairly, in the common sense that the words bore, *in the place and at the time*" they *were used*. It will be observed that the author is treating here of such rules as belong to the municipal law, in cases where chancery follows the law. If these passages have any meaning, they establish the right of giving parol testimony, to prove the signification of words used in a contract, in the place where the contract is made, and to show the *currency of that place*, by which I understand *its value* in comparison with any other description of currency. But of what use is such testimony, unless it be to ascertain the rule of damage, or the amount to be recovered? I can not discover any other object for which it can be required. If it be not to ascertain the value or amount of the currency spoken of, when reduced or raised to the kind of money or currency in which the court is to render its judgment, it would be wholly irrelevant.

In Cole *v.* Wendell, 8 Johns. 116, parol evidence was admitted to explain a written contract, by showing whether five cent. advance, stipulated to be paid, was to be calculated on the sum paid in on each share only, or on the nominal amount of the shares. In 8 Term, 379, parol testimony was admitted, to explain an agreement that appeared to be equivocal on the face of it.

In McInstry *v.* Pearsell, 3 Johns. 319, it was determined that a receipt was open to that kind of explanation, not directly contra-

dictory to, but consistent with it, and that parol testimony was necessary, as far as the receipt itself was equivocal.

In Noble v. Kerrsway, Doug. 510, which was an action on a policy of insurance, on a voyage to the coast of Labrador, it was objected by the defendant, that there had been an unnecessary delay in unlading the cargo, in consequence of which he was not liable by the terms of the policy. Lord Mansfield permitted the 225] plaintiff to prove *the custom of the same trade at Newfoundland, to show the true import of the policy, and the consequent liability of the defendant; and on a motion for a new trial, the court held that the testimony was properly admitted.

In 1 Caine, 43, we find that contracts may be explained by commercial usage, if the usage be proved to have existed a sufficient length of time to become generally known, and to warrant a presumption that the contract was made in reference to it.

The case of Parr v. Anderson, 6 East, 202, was on a policy of insurance. The difficulty arose on the construction of certain words used in the policy. The court held it material to ascertain, as a question of fact, in what manner the parties to contracts, containing the same form of words, had acted on them in former instances; and whether they had obtained in use and practice any, and what, known and definite import; and for that purpose they ordered a second trial.

In the case of Flowers v. Sproule, 2 Marsh. 58, Judge Rowan in delivering the opinion of the court, when speaking on the construction of contracts, says, the question should be determined by reference to the intention of the parties, and that intention should be ascertained, as well from the subject matter of the contract, the conduct of the parties relative thereto, and other extraneous circumstances, as from the face and import of the writing.

In the case of Doe v. Burt, 1 Term, 701, the plaintiff was permitted to give parol evidence of facts, relating to the premises described in a lease, for the purpose of proving the intention of the parties; and on a motion for a new trial, the court were unanimously of opinion that the testimony was properly admitted. They observed, that the objection was against the justice of the case, and that it might be necessary to put a different construction on leases made in different places.

In the case of Scott v. Bourdillion, 5 Bos. & Pul. 213, evi-

dence of usage was admitted, to show that rice was not corn, within the meaning of the memorandum.

In the case of Sleight *v*. Rhinelander, 1 Johns. 192; 2 Johns. 531, parol evidence was admitted to explain what was a sea letter, as used in the warranty.

In the case of Coit *v*. The Commercial Insurance Company, the question was, whether usage was admissible to control the ordinary and popular sense of a term used in the contract. The court say, "The law has been too long settled to be now questioned; that if any terms in a policy, have, by the known usage of trade, or *by use and *practice,* as between assurers and [226 assured, *acquired an appropriate sense, they shall be construed according to that sense and meaning.* This is not only the modern rule, as to mercantile instruments in general, but it appears to have been the established practice, as far back as the time of Ch. T. Rolle and of Lord Holt, and although Lord Eldon regretted the rule, yet he admitted that it was too late to question its force. To reject this testimony now, would produce the greatest injustice, for the contract must have been made and understood at the time by the parties, in reference to this mercantile and practical meaning of the terms employed." See 7 Johns. 390, and the cases there cited.

The case of Cutter, administratrix, *v*. Powell, 6 Term Rep. 320, was assumpsit for work and labor done by the intestate. The defendant had given a note to the intestate, promising to pay him a certain sum, provided he proceeded, continued, and did his duty, as second mate, from Kingston to the port of Liverpool. The intestate died before the ship reached Liverpool, and the question was, whether the plaintiff could recover. Lord Kenyon was of opinion that she could not by the terms of the contract; but observed, that if the court were assured that those notes were in universal use, and that the commercial world had received and acted on them in a different sense, he would give up his own opinion. Mr. Justice Lawrence said, if we are to determine this case according to the terms of the instrument alone, the plaintiff is not entitled to recover, because it is an entire contract; but if the plaintiff could have proved *any usage,* that persons in the situation of this mate are entitled to wages in proportion to the time they serve, the plaintiff might have recovered according to that usage.

These authorities seem to authorize the defendant to show, that in the general estimation and understanding of that part of the country in which this note was given, as well as by the express intention of the parties themselves, the terms made use of import a promise to pay two thousand numerical dollars of the paper described, or its equivalent in specie, and not so much of the paper as shall be worth two thousand specie dollars, and in default of such payment, an equal amount in specie.

The general rules laid down by elementary writers, for the construction of contracts, seem to lead to the same result. One of these rules is, "that anything which may appear ambiguous in the terms of a contract, may be explained by the common use of those terms in the country where it is made." Another rule is, 227] that "usage *is of so much authority in the interpretation of agreements, that a contract is understood to contain the customary clauses, although they are not expressed." A third rule is, "that however general the testimony be, in which an agreement is conceived, it only comprises those things respecting which, it appears, the contracting parties proposed to contract, and not others which they never thought of." In the case before us, it is absolutely certain that the thing about which the parties proposed to contract, and did contract, was a depreciated paper currency. A fourth rule is, "that we ought to examine what was the common intention of the contracting parties, rather than the grammatical sense of the terms." For these rules, see 2 Com. on Con. 533.

In this case, the common intention, that is, the intention of both parties, was the payment of two thousand numerical dollars of a depreciated currency, and not the payment of that sum in specie, whatever may be the grammatical sense of the terms they have used. It is a plain inference from these rules, that the law always regards the intention of the parties, and will apply these words to that which, in common presumption, may be supposed to be their intent; for if it were otherwise, the law would consist in form rather than in substance—the intention of parties would yield to grammatical construction, and contracts would be expounded and enforced in a way altogether variant from their original design.

A term or a phrase which has received a judicial interpretation, must be construed according to that interpretation, and can not be varied by reference to the usage of any particular place or kind

of business. As for example this court, in the case of Kimball *v.* Noble, having settled the meaning of the phrase *dangers of the river*, when used in a contract for the freight of goods, by parol testimony of the understanding and usage of men engaged in that business, a party would not now, in a similar case, be permitted to question the interpretation, by proving a different usage. So, in the construction of deeds and wills, terms which have been decided to convey a particular estate, can not be varied in their meaning by testimony of usage or common understanding; but, as in the case before us, there has been no judicial interpretation of the terms used in this note, the door for admitting parol testimony is open, nor could it lead, as has been observed, to the establishment of different rules of decision, for different parts of the country. The rule would be uniform, though the effect of its application might be variant. Where the currency called for, was equal in value to the description of money *for which the judgment of the court must be rendered, the [228 necessity of the evidence would be superseded, or, if admitted would produce no effect; but for all cases of depreciated currency, one rule would establish the measure of damage, as it does in property contracts. The idea, therefore, that different rules will be necessary, because the value of currency may vary at different places or at different periods, is not well founded.

I think I am correct in saying that no judicial decision has been made affecting the case before us. That many judgments have been rendered on similar notes is true, and probably the paper mentioned in some of them, might have been depreciated at the date of the note; but I do not know of any case in which the question was raised and decided by the court, except the cases which came before Judge McLean and myself, in 1822, where the testimony was admitted; but as it was understood that some of our brethren entertained a different opinion, the decision was not considered as settling the law.

According to my apprehension, the plain and obvious import of the terms used in this note would naturally lead to the same conclusion which the defendant proposes to confirm by the testimony offered, and that the principal use of the testimony is to show that the pretensions of the plaintiff are as consistent with the general understanding and usage of the country in similar cases, as it is with the literal meaning of the language used in the note.

I will here notice an argument which ought to have been con-

·sidered in an earlier part of this opinion. It is said that if the money had been paid when it became due, the plaintiff, instead of passing it off at its depreciated value, might have prosecuted the banks and compelled them to pay the nominal sum in specie. This is neither more nor less than an attempt to charge the defendant with the imaginary loss of a good bargain. It can not be presumed that the object of the plaintiff in selling his property, was to speculate in bank paper; but if it were, the result of the speculation, to say the least of it, was extremely doubtful. Had the paper been paid on the day, it is far more probable, from the failure of some of the banks and the known inability of others, that it would have perished in his hands, than that he could have realized the nominal amount in specie; but be this as it may, the law does not extend its views beyond the contract, it does not take into consideration the probable result of subsequent arrangements, which may be prosperous or disastrous. It does not regard the profitable use a **229]** plaintiff might *make of his money, as forming any part of the basis on which the rule of damage is founded. Hence the indorsee receives from his indorser the consideration paid, and no more, although it be less than the amount of the note or bill.

In this, as in other cases, the use to which the money might have been applied, and the result of the application, are not known to the court, nor is it regarded by the law.

The effect of such a principle, when reduced to practice, will be seen in a moment. If it be admitted at all, it must extend to property contracts, and lead to an inquiry into the profits that might possibly have resulted from a sale of the property contracted for, had it been delivered agreeably to contract. I can not perceive any difference, in principle, between the probable advantage that might have resulted from the possession of the bank paper, in this case, and that which might result from the delivery of property, or even the punctual payment of money, in any other. In either case a good bargain or speculation might be lost.

The principle adopted by my brethren necessarily leads to this inconvenience, that wherever a state is so unfortunate as to have its circulating medium consist of depreciated paper, as was the case with us when the note in question was given, and is now the case in at least one of our sister states, no contract can be made, with safety, predicated on the value of that medium. Experience teaches that the price of property is in proportion to the quantity and value of

the circulating medium. When that is abundant and greatly de-preciated, property acquires a fictitious value, which purchasers, however, may be willing and can afford to pay in the currency in which they are dealing; but it would be ruin to purchase on credit, for should accident or misfortune prevent a punctual payment, or should the paper entirely sink, or by other means be withdrawn from circulation, although this change may have reduced the price of property fifty or a hundred per cent., they must nevertheless pay the nominal sum in specie, equally regardless of the under-standing of the parties and of the terms used in the contract. To such a rule of decision I can not yield my assent, however un-pleasant it may be to differ from my brethren.

If the testimony had been admitted, it would have been necessary to determine the period to which it should apply. The rule as to property contracts, that damages shall be assessed with reference to the time of delivery, was arbitrary, and was adopted as much from the necessity of having some rule on the subject, as from the equity of that particular rule.

*The class to which the case before us belongs, has a strong [230 resemblance to property contracts, but there are some points of dif-ference that deserve consideration, and seem to require a variation in the rule. In property contracts, the parties are in the habit of esti-mating the probable value of the article at the time it is to be delivered, and govern themselves accordingly; but in the sale of property for current bank paper, they consider it as a species of money, and determine on the sum to be paid by a reference to its depreciation, compared with specie, at the time of the contract. If the price was set in specie and the payment agreed to be made in currency, an additional sum was charged equal to the depreciation; but when the price was set in currency, and the payment agreed to be in specie, a discount was made, equal to the difference in value, and these calculations were generally made with reference to the state of things at the time of the contract. They do not appear to have been considered as wagering contracts, nor does it seem to be good policy to place them on that footing. Property contracts are so considered, and great injustice is frequently done by unexpected changes in price, but not to the same extent, as would be the case in contracts like the present; because the variations in price can rarely be as great or as certain. Equity seems to require that the value should be taken at the date of the contract; because on that prin-

ciple the seller will receive, and the purchaser will pay, the precise value originally designed. If, at the date of a currency contract the paper designated was passing at a discount of thirty per cent., the payee would gladly have received specie at a proportionate advance, and such was every day's practice. Currency contracts were invariably made, with reference to the value of currency, at the time of the contract; and if, at a subsequent period, the payee should recover either more or less than that value, injustice would be done, and the original intent of the parties would be frustrated.

It is believed that the application of the existing rule to cases like the present would have an unhappy effect on public morals; it would put it in the power of some to demand money for which they had given no value, and of others to withhold money for which they had received value. It would give a legal sanction to injustice, and weaken the obligation of the moral sense; it would produce an effect on society similar to that produced by lotteries and games of chance; it would, in short, habituate men to acts of injustice and extortion.

In the case of Wharton, the court left it discretionary with the **231]** *jury to reduce the nominal amount by the scale of depreciation, or to find the value of the property and interest, on the day of sale, which was the date of the contract. The jury elected the latter, by which they must have given the same amount as would have been stipulated for, if the contract, in the first place, had been for specie. This was certainly equitable, and seems to be the rule which justice requires in the present case. It is also worthy of remark that, in that case, the counsel for the plaintiff put the case on the ground of a fair and lawful wager, depending on the appreciation or depreciation of the money on the day of payment. They contended that as paper money had entirely sunk, and was out of circulation, on the day of payment, they had a right to receive the nominal amount in the currency of that day, which was specie. The court, however, did not view it in the light of a wagering contract, and directed that the recovery should be for the value of the money described, or of the property sold, at the time of the contract.

Before I dismiss the subject, it is proper to state, that owing to circumstances not within the control of the court, I have not had

an opportunity of perusing the opinion in this case; the conse-quence of which may be the omission of some points that ought to have been considered.

Judgment for the plaintiff, for two thousand dollars, with in-terest.†

---

*[*The following cases, decided upon the circuit, were not* [232 *received by the Reporter in time to be inserted in their proper place.*]

---

†NOTE BY THE REPORTER.—See the case of Hunt *v.* Rousmanier's Adm'r, 8 Wheat. 174. In this case, the Supreme Court of the United States decided that where a party, through *mistake* and *ignorance of law*, executes a writing which does not carry into effect the contract and the intention of the parties, parol evidence may be received to establish the fact, and the true contract and real intention of the parties enforced in equity; and this where no fraud is alleged, nor no mistake in a matter of fact, but a mistake in point of law only, the legal effect and operation of the writing not being such as the par-ties intended.