180     SUPREME COURT OF OHIO.

The Cleveland & Pittsburgh R. R. Co. *v.* Kelley and others.

THE CLEVELAND AND PITTSBURGH RAILROAD COMPANY *v.*
JAMES KELLEY AND OTHERS.

1. When a contract is entered into for work at a certain price, with a stipulation that the same is to be paid for in specific articles at a certain rate or price, the debtor has an election to deliver the articles, or pay the specified amount of money, if such right of election is expressed or fairly to be implied.
2. If such election is not expressed, and the subject matter of the contract or *res gesta* indicate that no such right of election was contemplated by the parties, then the general rules of law relating to executory sales are applicable, and the contract is a single and imperative promise to deliver the specific articles.
3. If the right of election to pay in money or the articles, at the option of the debtor, exists, and the articles are not delivered, the plaintiff recovers the amount of the debt and interest; but if no such election is expressed or implied, the plaintiff is entitled to the market value of the articles, with interest.

IN error to the Court of Common Pleas of Columbiana County.

So far as the question decided in this case is concerned, the facts may be stated as follows:

The suit in the common pleas was brought by the defendants in error to recover a balance due them for work done for the plaintiff in error, in the construction of the Tuscarawas Extension of its railroad, in pursuance of written contracts between the parties.

Before and at the time the contracts were executed, the Chief Engineer of the railroad company announced to those who were giving in their bids for the work, that they would be required to take twenty-five per cent. of the price of the work to be done in the stock of the Extension, at par.

In the proposals put in by the defendants in error, they specified the prices at which they would contract for the work, and then said, " we take 25 per cent. in stock of company."

In the contracts referred to, the company agree to pay so much per section for grubbing; so much per cubic yard for embankment, excavation, solid rock and loose rock respectively; and so

DECEMBER TERM, 1855.          181

The Cleveland & Pittsburgh R. R. Co. *v.* Kelley and others.

much per perch for rectangular culverts. And it is provided that " there shall be a final estimate made of the quantity, character and value of said work, agreeably to the terms of this agreement, when the balance appearing due to the party of the first part shall be paid to them," etc.

At the end of the contracts, and when they were made, these words were written: " It is understood that twenty-five per cent. is to be taken in stock."

It appears further from the record, that before and at the time the contracts were executed, it was talked of, and understood by both parties to the contracts, that the stock which the defendants in error were to receive under the contracts was to be taken by them at par.

In the court below the case was submitted for trial to referees, and it was made a question before them, whether, in estimating the balance due to the contractors, they should be allowed the *par value* of the stock, or only *the market value ;* they having demanded of the railroad company the pay for their work, when the same was payable, and payment not having been made. The referees reported that the stock was to be paid by the railroad company and to be received by the contractors *at par ;* that they found payable to them in the stock of the company the sum of $21,986.24, but that they should recover only the amount of the market value of the stock, at the time the same was demanded and payment refused.

To this finding of the referees, the contractors excepted, and the court below thereupon entered judgment " that the rule of damages for the failure to pay said stock, is fixed by the contracts of the parties, and is the full sum of $21,986.24," etc.

To reverse this judgment, this petition in error is prosecuted.

*W. S. C. Otis,* for plaintiffs in error:

The court below, in enlarging the measure of damages awarded by the referees, committed most manifest error.

Damages are a compensation for an injury sustained. *Dexter* v. *Spear,* 4 Mason 115.

In those contracts in which the plaintiff is to receive for his

labor, not money, but the transfer of property, the original consideration is not open to inquiry, but the value of the property which is to be transferred is the measure of damages. *Strutt* v. *Farlan*, 16 Mees. & W. 249 ; *Ellison* v. *Dove*, 8 Blackf. 571 ; *Baldwin* v. *Leonard*, 8 Cobb 71.

In cases of contracts for payment in specific articles, where the articles to be paid are described in respect to quantity or amount, by number, weight, or measure, and the contract does *not name any sum to be paid*, the measure of damages, on failure to perform the same, is the value of the articles when the contract was broken. But in cases of contracts for payment in specific articles, when the articles to be paid are described in respect to quantity or amount, by number, weight, or measure, and the contract does *also name a sum to be paid*, the measure of damages, on failure to perform the same, is not the value of the articles when the contract was broken, but the sum named in the contract. *Brooks* v. *Hubbard*, 3 Conn. 58 ; *Moore* v. *Hudson River Railroad Company*, 12 Barb. 156.

A contract to pay to the order of a person therein named, " twelve months from date two hundred and fifty dollars, in brown cotton shirting, at the price of thirty cents a yard," (*Brooks* v. *Hubbard*, 3 Conn. 58,) and a contract to pay to the order of a person therein named, " seventy-nine dollars and fifty cents, on the first day of August, 1822, in salt, at fourteen shillings per bushel," (*Gleason* v. *Pinney*, 5 Wend. 393,) are promissory notes, payable in specific articles, for each admits a definite, existing money indebtedness, coupled with a stipulation for a mode of payment other than in money.

It has frequently been decided that contracts, payable " in current Ohio bank notes " — " in currency " — " in current money " — " in bank notes current in the city of New York "—" in current money of the State "—are promissory notes payable in money ; but all these decisions proceed upon the ground that the notes, or currency, were those of the States respectively in which the decisions were made, and were known to be of specie value. It has also been more frequently decided that contracts, payable in depreciated bank notes, are contracts for the delivery of prop-

erty merely ; and that the measure of damages, on a breach of the contract, is the specie value of the bank notes when the same were payable. *Robinson* v. *Noble's Admrs.*, 8 Peters 181 ; *Philips* v. *Riley*, 3 Conn. 266 ; *Clay* v. *Huston's Adm.*, 1 Bibb 461 ; *Anderson* v. *Ewing*, 3 Litt. Rep. 245 ; *Chambers* v. *George*, 5 Litt. Rep. 335 ; *Gordon* v. *Parker*, 2 Smedes and Marsh. 485 ; *Hixon* v. *Hixon*, 7 Humphreys 33 ; *Ogden* v. *Slade*, 1 Texas 13 ; *Farwell* v. *Kennett*, 7 Missouri 595 ; *Dillard* v. *Evans*, 4 Pike 175.

If a contract, because it relates to depreciated bank notes, would be construed differently from all like contracts, then it would be competent to resort to extrinsic evidence to show in what sense the words were used. *Hildebrand* v. *Fogle*, 20 O. R. 147 ; *Barrett* v. *Allen*, 10 O. R. 426 ; *Lowry* v. *Adams*, 22 Vt. Rep. 160 ; *Knight* v. *N. E. Worsted Co.*, 2 Cush. 271 ; *Bradley* v. *Steam Packet Co.*, 13 Peters 89 ; *Hart* v. *Hammett*, 18 Vt. Rep. 127 ; 1 Greenleaf Ev. 365, sec. 286 ; Ib. 360, sec. 282 ; and note 4 on page 358 ; Story on Prom. Notes, sec. 638, 479.

In a suit brought upon a note for payment to the Bank of Illinois of $131,480.52 in the State of Illinois indebtedness, it was held, upon a careful consideration of the authorities, that the amount to be recovered thereon was the market value of the Illinois indebtedness at the day of the maturity of the note. *Smith* v. *Dunlap*, 12 Illinois Rep. 184.

The language of the stipulation is—"It is understood that twenty-five per cent. is to be taken in stock." This is a contract to take stock, not to pay it ; and the phrase, *twenty-five per cent.*, describes the quantity or amount to be taken.

In a contract to pay ten thousand dollars in the stock of the Cleveland and Pittsburgh Railroad Company, the *sum named* would be regarded by all business men as descriptive of quantity, amount, or par value, though a more technical mode of expressing the quantity might be adopted by describing the number of shares. Indeed, no other construction could be given to the contract, whether regard be had to the common sense of mankind or the well established rules of legal interpretation. The measure

of damages, therefore, on a failure to perform the contract, would be the market value of the stock when the contract was broken. This position is sustained by precedents, as well as upon principle. *Moore* v. *Hudson River Railroad Company*, 12 Barb. 156; *Porter et al.* v. *Buckfield Branch Railroad*, 1 Am. Railway Cases 185. Also, see cases before cited.

For the neglect or refusal of the company to issue the certificates of stock, the measure of damages would be, in accordance with the rule laid down in England, New York and Massachusetts, the highest price of the stock between the time of the neglect or refusal to issue the certificates and the commencement of the suit. *Shepherd* v. *Johnston*, 2 East 211; *Downs* v. *Buck*, 1 Starkie 318; *McArthur* v. *Seaforth*, 2 Taunt. 257; *Harrison* v. *Harrison*, 1 Car. & Payne 412; *Williams* v. *Archer*, 5 Man. Gr. & Scott 318; *Archer* v. *Williams*, 2 Car. & Kir. 25; *West* v. *Wentworth*, 3 Cow. 82; *Clark* v. *Pinney*, 7 Cow. 681; *Kortright* v. *Buffalo Com. Bank*, 20 Wend. 91; *Wilson* v. *Little*, 2 Conn. 443; *Sargent* v. *Franklin Ins. Com.*, 8 Pick. 90.

*Mason & Estep*, for defendants in error.

We claim the rule of the law to be that the damages for the breach of a contract to pay an ascertained or certain sum in specific articles, are *fixed by the contract itself*, and are the amount of the debt ascertained by the contract. This rule is established by authority too strong to be controverted. We content ourselves with citing leading authorities in five States: *Morris* v. *Edwards*, 1 Ohio 189; *Brooks* v. *Hubbard*, 3 Conn. 58; *Gleason* v. *Pinney*, 5 Wend. 393; 5 Wend. 189; *Mason* v. *Briggs*, 16 Mass. 453; 3 Blackford 189.

It would be useless to deny that, in the language of Judge Hitchcock in 1 Ohio, " if the contract be for the payment of one hundred dollars in wheat," or of one hundred bushels of wheat *at one dollar per bushel*, and payment be not made, " the damages would be $100; " or, if the contract be " to pay $75.50 on the 1st day of August, 1822, in salt at 14 shillings per bushel," the damages will be $75.50, although salt should not then be worth 5 shillings per bushel. It is admitted by the counsel that such

is the legal effect of such obligations, because they say that they " admit a definite existing money indebtedness, coupled with a stipulation for a mode of payment other than in money."

In the present case, Kelley & Co. were, by the contract, to do certain work for which they were to be *paid*—a part in cash and a part in stock. The price of this labor is fixed by the contract, the amount is to be made certain by the measurement provided for by the contract, the time of payment is fixed, and it is an indebtedness declared by the contract to be in dollars and cents— *a money indebtedness*.

The counsel say that there is no covenant on the part of the company *to pay* the stock. There is no covenant to *deliver stock* upon which Kelley & Co. could sue, which the court could enforce. It is not a contract for the delivery of stock, else it could be enforced. It is an agreement on the part of Kelley & Co. that they will receive part payment of an indebtedness to accrue to them, *in stock*, and such an agreement as they can sue upon ; but they must sue for the *debt*, for their *pay ;* they cannot sue for stock, because there is no covenant to deliver it. The language of the covenant of the company is this : " There shall be a final estimate made of the quantity, character, and value of said work, agreeably to the terms of this agreement, *when the balance appearing due to the party of the first part shall be paid to them*." You may add, if you please, *three-fourths in money* and *one-fourth in stock*. Upon this covenant Kelley & Co. can sue.

It is said that this is not a *promissory note*, payable in specific articles. It certainly is not; but the courts and writers on this subject speak of this rule of law as governing *contracts* for the payment of an indebtedness in specific articles. Aside from the objection that the obligation to pay in stock is not a *note* for specific articles, we do not see why the case of *Morris* v. *Edwards* does not answer every one of the arguments of the counsel, and we are content to point to that case, and to the reasons given by Judge Hitchcock to sustain it, as an answer to the argument. If current bank notes are *specific articles*, we think it very certain that railroad stocks are.

J. R. SWAN, J., delivered the opinion of the court.

The only question which it is deemed necessary to decide in this case is, whether the court of common pleas erred in changing the measure of damages awarded by the referees, from the market value to the par value of the stock, found due by them. We do not pass upon the errors suggested by the defendants in error, in the argument of their counsel.

In contracts in which a party is to receive for his labor, not money, but the transfer of property, the original consideration is not open to inquiry; but the value of the property which is to be transferred is the measure of damages; and, in general, if a party promises to deliver at a future day a specific article, and at a certain price or rate, and the promise is broken, the vendee recovers in damages the difference between the market value at the time of the breach of the contract and the price he agreed to pay. Such agreements being simply contracts of sale, the rule of damages is well settled.

But in New England and in this State, there was a period when property of all kinds had inflated prices, beyond what it would readily command in money. During this period, a debtor found it for his interest to obtain an election, either to pay a debt in money or in specific articles, at a certain price; and contracts of that kind were very common. These contracts frequently assumed the shape of notes. Whenever the right of election on the part of the debtor to pay a debt in specific articles or money was clearly expressed in the contract, or such election was fairly to be implied, the courts had no difficulty in determining the rights of the parties, if the specific articles were not delivered; for, the election being with the debtor, if he did not deliver the articles he was presumed to have elected to pay the debt in money, and, consequently, the debt only, with interest after due, could be enforced against him. *Trowbridge* v. *Holcomb et al.*, 4 Ohio St. Rep. 38; *Morris* v. *Edwards*, 1 Ohio Rep. 189; *Brooks* v. *Hubbard*, 3 Conn. 58; *Perry* v. *Smith*, 22 Verm. 301.

But these trade notes were in many cases so imperfectly drawn that the courts were frequently embarrassed in ascertaining whether the amount of the money debt mentioned in the contract

was the measure by which the damages were to be ascertained, upon non-fulfillment, or the market value of the specific articles, that is, whether the debtor had an election, or whether it amounted to an imperative obligation to deliver the articles specified. Thus, in the case of *Pinney* v. *Gleason*, 5 Wend. 393, a note had been given in the following form: "For value received, I promise to pay A. B. $79.50, on," etc., "in salt, at fourteen shillings per barrel." The note was given in part consideration for a house and lot, sold and transferred by the payee to the maker. The salt was worth less than fourteen shillings per barrel when the note became due.

It will be observed, that the price of the salt was fixed, and the quantity could be measured only, by the amount of the money indebtedness designated by the note ; and, therefore, when the note was given, the parties had an option, either to calculate the amount of salt that would have satisfied the money debt, and draw the note as an absolute agreement to deliver a specific quantity of salt, and without even naming any price ; or to leave the money debt to stand, and designate how, and at what rate, salt would pay it. The face of the note shows that the parties chose the latter course, although they had all the elements before them to have adopted the former if they had agreed to do so.

There was a difference of opinion among the judges of the Supreme Court as to the true construction of this note ; some holding that, as the defendant was indebted to the plaintiff in a certain amount, in money, and the plaintiff, having elected to take salt at a certain price, instead of money, he took his chance of the market ; and that, therefore, the value of the salt, when the promise was broken, was the proper measure of damages.

The court of errors, however, were able to find in the terms of this contract, or the circumstances under which the debt was created, that the defendant intended to have an election to pay the money or deliver the salt, and having, by default in the delivery of the salt, elected to pay the money, the plaintiff was entitled to recover the money debt of $79.50, with interest. The construction given to the note by the court, in this case, was probably correct, (see cases supra;) but was doubted by Parker, J., in

*Wilson* v. *George*, 10 New Hamp. 449; and see *Smith* v. *Smith*, 2 Johns. Rep. 235; *Clark* v. *Pinney*, 7 Cowen 681; *Mason* v. *Philips*, Addison 347; *Edgar* v. *Boies*, 11 Serg. & Rawle 445.

It is not, however, very material to the principle which governs such cases, whether the court erred or not in the construction of the note itself; for the true rule governing cases of this kind was adhered to; that is, where a money indebtedness exists, and the debtor reserves the right of election to pay his debt in money or specific articles, at his convenience, and he fails to deliver the articles, he remains responsible only for the amount of the money debt, whatever may be the market value of the articles.

In *Cole* v. *Ross*, 9 B. Mon. 393, it was held, that a covenant to pay $3,333.33, "*payable* in good merchantable pig metal, delivered on the bank of Greenupsburg, at twenty-nine dollars per ton," was an imperative obligation to pay pig metal. The court say : " The expression ' payable in good merchantable pig metal,' clearly points out the thing which is to be paid; it is not of the same import as the expression *may be paid* in pig metal. The latter, if used, would have implied an election to pay in the thing named or not, as it might suit the convenience of the obligor; the former, in direct and positive terms, makes the amount payable in the thing specified, and shows that it was really a contract for pig iron, *and not for money which might be paid by the delivery of the article named;* and that the sum mentioned was merely the medium by which the quantity of the thing contracted for was to be ascertained, according to the stipulated value per ton." So in the case of *Mattox* v. *Craig*, 2 Bibb. 584, a note was given for the payment of " eighty-nine dollars *to be discharged* in good merchantable brick; common brick at four dollars per thousand, and sand brick at five dollars per thousand, *to be delivered* at the house of," etc. The court say that, " the expression ' to be discharged in good merchantable brick,' etc., cannot be construed to give an election to the debtor to pay in bricks or not, as might suit his convenience, but plainly imports an imperative obligation."

The decisions in these three cases are not contradictory in prin

ciple, but might have been consistently decided by the same court at the same time.

I have referred to them for the purpose of showing that the only difficulty in determining the rights of parties to such contracts, is, to ascertain whether it was their intention to give the debtor an election, the same as if the contract'had in express terms stipulated that the debtor might, at his option, pay the debt in money, or in the articles specified, at the fixed rate. And the necessity of finding this intention expressed or fairly implied, and its controlling effect in determining whether the contract is imperative and single for the delivery of the specific articles, or is in the alternative, and at the election of the debtor, will probably be found in all the reported cases upon this subject.

Notes and contracts have been so drawn as to leave the question of election in so much obscurity as to produce some confusion in the application of the rule. *Phelps et al.* v. *Riley*, 3 Conn. 266 ; *Brooks* v. *Hubbard*, Ib. 60 ; but the rule itself has never been departed from, and has always been applied to settle the construction of the contract and the rights of parties. 2 Parsons on Contracts 490.

It will also be found, that in all these cases, the court find, either from the terms of the contract, its subject matter, or the nature of the indebtedness upon which the note or contract is based, that the parties were dealing about a money indebtedness, which it is agreed may, if the debtor choose, be paid in specific articles.

In the contract between the railroad company and the contractors in the case before us, there is no express reservation on the part of the company, of an election to pay in money instead of stock, the amount represented by the stock. The contracts being silent on that subject, we must ascertain whether it may be fairly implied, either from the form of the promise, the circumstances of the case, or the subject matter of the contract.

In order to take this case out of the general rule, which, considering the railroad stock as an exchange for the contractors' work, would entitle the contractors to the market value only of the stock, if not delivered, the contractors urge, that the rules of

law applicable to trade notes and contracts of like kind, must govern the court in the construction of this contract; and consequently, that, on the default of the railroad company to deliver the stock, the contractors were entitled to its nominal par value, irrespective of its market value.

To sustain this position, we must find:

1st. That the parties contemplated an election on the part of the railroad company to deliver the stock, or to withhold it, and pay in money the amount represented by the stock. To imply this, however, we must also find,

2d. That the parties contemplated a money indebtedness to the amount of the work represented by and to be paid for in stock.

It was the duty of the referees, acting as a jury, and endeavoring to ascertain whether the railroad company intended, in this case, to reserve an election to pay money, to judge of the motives and objects of the company in requiring the contractors to take one-fourth in stock; and the referees might well ask, shall we assume, from the circumstances under which the contract was made, that a railroad company, when it commences its work and requires funds to build its road, is indifferent whether its stock is taken at par, or whether the stock remains altogether unsubscribed. It may be that the referees should forget that no railroad was ever built in the United States by funds derived from its stock alone; but should they ignore the fact that the certificates of stock are the first things that a company should and must dispose of, and the last which it desires to purchase and pay for, in money, at par? We think not. *Hildebrand* v. *Fogle*, 20 Ohio Rep. 147. How, then, can an implication arise, that the railroad company intended to reserve an election to pay money instead of stock, in the absence of any stipulation to that effect?

Indeed, the ground upon which it is claimed that such an implication can be made, arises from the fact, that the prices of the work are named in monetary terms, and it is insisted that these monetary terms were intended to designate and measure a money indebtedness, and therefore imply an election.

In the first place, it should be understood that the parties could

not ascertain the amount of stock to be taken, until the amount of work was estimated; and the estimate could not be made until the work was finished. Hence none but monetary terms could be used in an executory contract, in regard to the price of this work. When a trade note is given, as in the case above cited of *Pinney* v. *Gleason*, for a certain amount of money, payable in specific articles at a certain rate, it is wholly unnecessary for the parties, if they intend a single and imperative obligation to deliver the specific article, to use any monetary terms whatever, or indicate a money indebtedness; for, a simple arithmetic rule would determine the quantity; and because they can, but do not, state simply a promise to deliver a certain quantity of specific articles, without indicating a money indebtedness, is a leading reason why a money indebtedness is presumed, and an election implied.

But, in the case before us, as monetary terms were necessarily used, the reason for an implication that they were intended to indicate a money indebtedness in respect to the specific articles, and the reservation of an election, does not arise. But aside from this, and looking to the subject matter of the contract, let us ascertain whether it may be fairly presumed, from the manner in which the stock was brought into the contract, and arbitrarily measured at par, that a money indebtedness, in respect to the stock, was contemplated by the parties. I say at par, for such was manifestly the intention of the parties.

The contract shows, that the stock was in a road to be made. The value of the stock would, therefore, depend upon the correctness of the estimates of the engineers for its completion; the ability of the company to finish it; the capacity of the officers managing it, and the profits which might accrue in a new and yet untried enterprise. Its value was uncertain and merely speculative. It was capital stock not in esse. It had none of the ordinary elements of certainty in its value, which applies to goods.

The contractors did not propose to do the work for cash payments, and afterwards agree to take stock for one-fourth of such money indebtedness. On the contrary, and it is an important circumstance in respect to this view of the case, the railroad company, before any bids were made by contractors, stipulated that,

for one-fourth of the work, the contractors should take stock at par; a condition obviously worse for the contractors, and attended with more risks than money payments. To imagine that such a condition was interposed by the company, under the expectation that the work would be done cheaper than for a like amount of money, and that the company and contractors supposed that it was preferable to money, would be shutting out all knowledge of the common transactions of men, and assuming that, in the hands of contractors, there is no difference between ten thousand dollars in money and ten thousand dollars of stock in a railroad that had no existence.

The railroad company invited bids burdened by payment of one-fourth in this speculative stock at par. The bids and prices were fixed by the contractors, with full knowledge of this proposition on the part of the company. The referees, acting as a jury, had a right to presume that the contractors, in fixing their prices for the work, took into consideration the kind of pay they were to receive, and the risks incident to payment of one-fourth in speculative stock at par. Each share of stock at par, expressed, in monetary terms, fifty dollars. But its real value being uncertain and speculative, these monetary terms did not express its real value. The contractors, however, were required to take the stock at par, that being the arbitrary value fixed by the company; and the contractors, to equalize real values and cover the risks, necessarily introduced like arbitrary monetary terms in the price of their work. In other words, it was a stock, and not a money price. Hence the amount of work which was to be paid for in stock, was not, in fact, in the contemplation of the parties, a money indebtedness, although monetary terms were used to express the amount; for the contract was undoubtedly made and the prices fixed with direct reference to the medium of payment.

Even if the speculative value of the stock had been estimated by the contractors above the arbitrary value fixed upon it by the railroad company, the price of the labor was fixed below the monetary terms used. So that in either event, the real measure of the indebtedness was not expressed.

The amounts thus expressed, both as to the stock and the

prices of the work, not being the measure of a money indebtedness, and the contractors on the one hand having indemnified themselves for the risk, and the company on the other having paid for the risk, in the price of the work, it would be doing very manifest injustice to now give to the contractors, in cash, what was measured by payment in speculative stock.

In the absence of an express reservation of election upon the part of the railroad company, to retain their stock and pay par for it, can such an intention of the company be implied under the circumstances?    To sustain such an implication the referees must have supposed that the company, in the first place, required contractors to make bids and raise funds to build the road, and take one-fourth of the amount in the stock of the company, at par, thus enhancing the price of the work in monetary terms; and that the company at the same time proposed to treat that enhanced price as an indebtedness in money, and to reserve an election to keep the stock and pay in cash the amount of the indebtedness represented by the stock at par.    It seems to us but necessary to state the proposition, to show that such an intention could not have existed.

But there is another view of the case which we think entitled to weight.    Where a contract is doubtful in its terms, and will bear two different constructions, one involving a breach of trust or improper conduct, and the other not, the latter construction prevails.    This rule especially controls when a court or jury are dealing with implied contracts and intentions.    Now, it was the duty of the railroad company to apply its funds, whether borrowed or derived from stock subscription, to the building and equipment of the road.    It was neither the legitimate business of the company, nor within the scope or object of its charter, to speculate in its own stock.    It would have been an improper application of the funds of the company to substitute its money for, and to become a purchaser of its own stock; and an intention to thus divert the funds of the company from their legitimate objects ought not to be implied, in the absence of any express stipulation to that effect.

For these reasons we are of the opinion that no such election

was contemplated by either of the parties when the contract was entered into; that the law relating to trade notes and contracts of a like kind, has no application to the agreement between these parties; that it was an exchange of work for stock, in which monetary terms were necessarily used, not for the purpose of expressing real values, but as the only mode of expressing quantities and proportions; that the fourth to be taken in stock was not a money indebtedness, but a stock indebtedness; and, consequently, that the company could derive no benefit from the increased value of the stock, and could suffer no loss by its depreciation: the damages which the contractors suffered from the non-delivery of the stock being its market value.

The judgment of the Court of Common Pleas reversed, and the cause remanded.