BATES, administrator, etc., v. CHERRY VALLEY, SHARON AND ALBANY RAILROAD COMPANY, appellant.

*Contract — construction of — payment in corporate stock.*

Plaintiff's testator performed certain services for a company organized to build a railroad. At a meeting of the board of directors it was resolved that for his past services he should receive a specified sum payable in stock of the company, and for his future services at a certain rate payable in the same stock. The terms of compensation were accepted by the testator. At the time, there was no stock issued, and all parties believed that it would be, when issued, of par value. *Held,* that the payment of such services was to be in stock of the company estimated at its nominal or par value, and not at its market value.

APPEAL from a judgment entered on the report of a referee.

The recovery was for $6,758.01 damages and costs, and was allowed for services rendered to the defendant by the plaintiff's intestate, De Witt C. Bates, including use of team, and for money advanced by him in performance thereof, and also for office rent.

The intestate performed most of the services for which the judgment was rendered, under and in pursuance of resolutions passed by the board of directors of defendant, which, in effect, were contracts with him declaring his rate of compensation and the mode of payment.

The first of these resolutions was adopted July 9, 1868, and after various recitals stating that Mr. Bates had expended much time, labor and expense in the business of the company, and that it was necessary to continue his services in that behalf, and after appointing him especial agent and attorney of the road, it was resolved that there should be allowed to him for all his past services and expenses the sum of $1,000 of the stock of the company, and that he be paid in the stock of the company for his future services the sum of $10 per day as such agent and attorney, while engaged in such business; and whenever such business required him to be absent from the village of Cherry Valley, he should be allowed in addition thereto his expenses, including the use of team, etc., "the items of which shall be rendered in detail to the board of directors, and which shall also be paid in the stock of said road. Always provided, that the directors are to incur no personal responsibility for or on account of such services and expenses of said Bates; but he shall rely entirely upon the stock of such railroad company for his compensation."

On the 2d February, 1870, the following resolution was adopted by the company: "*Resolved*, That for compensation to De Witt C. Bates, for his services and expenses hereafter, including use of team as heretofore, he at his election be paid in the first mortgage bonds of the road, or in the stock of the road."

The referee found that Mr. Bates performed services for the company under the resolution or agreement of July 9, 1868, which, with his expenses and the use of team, also including the $1,000 for prior services and expenses therein mentioned, amounted to $4,245.17; and that he rendered services for the company under the resolution of February 2, 1870, which, with his expenses and use of team, amounted to the sum of $439.28.

He also found that the former sum was, by the terms of the contract (first resolution), payable in the stock of the company; and that the latter sum was, according to the contract (second resolution), payable in first mortgage bonds, Mr. Bates having so elected.

The referee further found that, at the time of making the contract of July 9, 1868, and during the time of the rendition of the services thereunder, both parties believed that the stock would be worth par when the road should be completed and be put in operation; that the road went into operation in June, 1870, but has earned nothing, and that the stock has been and still is of no market value; also, that the bonds were not of par value.

In giving construction to the contracts (resolutions) the referee held that the market value of the stock and bonds, and not par value, was contemplated and intended by the parties, and in giving judgment he awarded damages, estimating the stock and bonds at par value. To this ruling and decision an exception was interposed.

Other questions are raised on the appeal; but the conclusion arrived at, on the point above presented, renders their examination here unnecessary.

*J. E. Dewey*, for appellant.

*J. W. Bates*, for respondent.

BOCKES, J. Undoubtedly the resolutions were correctly held to be contracts, binding on the parties according to their terms. They contemplated the rendering of services and the incurring of expen-

ses by one party for and in the business of the other, and fixed both the rate of compensation and the mode of payment. Indebtedness against the company arose thereunder, which was to be satisfied by payment in the manner stated, and agreed upon in the contracts. So much of it as had its origin under the resolution of July 9, 1868, was "*to be paid in the stock of the company;*" and so much as had its origin under the resolution of February 2, 1870, was to "*be paid in the first mortgage bonds of the road, or in the stock of the road,*" as the payee should elect. The referee held that the legal effect of the contracts was, that payment was to be made in stock, in the one case, and in bonds or stock in the other, at the election of the payee, to be estimated at the market value and not at par or nominal value. In speaking of the defendant's liability under the resolution of July 9th, the referee says, "that the stock of the defendant's company being worthless and of no market value, and the defendant having refused to deliver the same at any other than its par or nominal value, the said debt became payable in money;" and he directed judgment for the full amount of the debt.

Now, the contract specified the mode of payment. Payment was to be in stock; but how the stock was to be estimated — whether at market or par value — was not stated in terms. In this regard the contract was open to construction. The referee read it as if the words *at market value* had been inserted. Thus read, the agreement was to pay a certain sum of money (the amount of the indebtedness when determined), in specific property (in stock), at a stipulated price (its market value); in which case the measure of damages for non-delivery would be the sum by the contract agreed to be paid. *Rockwell* v. *Rockwell*, 4 Hill, 164; *Pinney* v. *Gleason*, 5 Wend. 393; *Murray* v. *Harrison*, 47 Barb. 492, 493. In such case the delivery of the property is a mere mode of payment of a stated, specified sum or debt, which may be satisfied by a tender kept good, of the property at the price fixed, or in money at the option of the party obligated to pay. This view of the case under examination will vindicate the decision of the referee.

But was he right in holding that the contract (reference is here made to the resolution of July 8) should be construed as if it provided for payment in stock at market value?

Now, what was the intention of the parties? Whether the stock was to be estimated, in making payments, at market or par value, was not expressly stated. This was left for fair inference on con-

sideration of the case on all the facts. The nature of the contract, its object, the situation of the parties, and, indeed, all the circumstances surrounding and influencing them in entering into it, are proper subjects for reflection and guidance. Let us consider the case in the light of those incidents. An enterprise of magnitude and of public importance was in contemplation. A company was organized to secure its accomplishment. Mr. Bates was one of its officers, and was especially interested in its promotion and success. No stock had yet been issued — of course, it then had no market value; but as the referee finds, both parties to the contract believed that it would ultimately be worth par. The stock on its face would express a sum as an exponent of value. It would, when issued, represent a numerical amount as its value. It was to be received in payment for services; and thus in one view the arrangement, when carried out, would operate as an exchange of services for stock. It differed widely from the case of an agreement providing for the payment of a fixed and certain sum in a merchantable commodity, as in logs, lumber, wood or specific articles of merchandise, having at the time a recognized value, with the absolute certainty that it would, in all future time, retain and have value in market. Did the parties contemplate the contingency which did actually occur, that the stock would be worthless and would remain so, in which case payment might be exacted in money? Clearly not, for the contract expressly provided that Mr. Bates should "rely entirely upon the stock of such railroad company for his compensation." So, too, as to payment for his prior services, he was to be allowed, in the language employed, "the sum *of one thousand dollars of the stock of the company.*" Unlike articles of merchandise, the stock carried with it an index of value. Every share in stock represented on its face the money value of $50; and in view of this fact, and of those above alluded to, considering the purposes and object the parties had in contemplation and the circumstances surrounding them and influencing them at the time they entered into the contract, I am of the opinion that it was intended that payment might be made in stock to be estimated at par value. Such should be deemed to be its fair and just import and construction. For past services and expenses, Mr. Bates was to be allowed $1,000 "*of the stock of the company,*" and for future services, he was to be paid *in stock,* and he agreed to rely entirely upon stock for his compensation. These expressions considered with reference

to the subject-matter of the contract, holding in mind the circumstances surrounding the parties at the time, show, as I think, quite conclusively, that payment in stock, estimated at its capital stock estimate, was intended. The evidence shows, too, that Mr. Bates so construed the contract himself. His understanding of its import may also be considered in connection with the surrounding facts and circumstances.

This conclusion is supported by the decision in *Cleveland & Pittsburgh R. R. Co.* v. *Kelley,* 5 Ohio St. 180. In this case the contract was that the party should take twenty-five per cent " in stock of the company." It was held that stock at par value was manifestly intended by the parties; that the twenty-five per cent to be taken in stock was not a money indebtedness, but a stock indebtedness.

The decision in *Smith* v. *Dunlap,* 12 Ill. 184, was to the same effect. The action was on a note for $131,480.52 payable " in State of Illinois, indebtedness." The court said that where the "promisor agrees to pay a certain sum in bank notes or other evidences of indebtedness, which purport on their face to represent dollars, and can be counted as such, the sum is expressed to indicate the number of dollars of the notes or evidences to be paid, and not the amount of the debt or consideration; " and it is added " the obligation is, in fact, but a promise to deliver so many dollars numerically of the securities described." The case of *Barker* v. *Troy & Rutland R. R. Co.,* 27 Vt. 766, can hardly be deemed an authority here, as considerations of an equitable character were brought into it, which to a considerable extent controlled the decision. We are referred to the case of *Hart* v. *Lauman,* 29 Barb. 410, as an authority in favor of the ruling of the referee in this case. The point was not there directly before the court. The learned judge says: " The question whether they should have tendered the amount due at its current market value, or at the nominal value of the shares, does not necessarily arise here." But he proceeds to discuss the question at considerable length, and arrives at a conclusion as applicable to the facts of that case, adverse to that above expressed in this. That case, however, differs from this in some of its material facts, one of which is, that at the time the agreement was made, the stock had a money value. The learned judge gives this fact significance. He says, " it was this value " (its money or market value) " which the parties had in contemplation, and which was to extinguish the

indebtedness." But in the case at bar the stock, at the time of the agreement, had no market value, but had prospective value then estimated by the parties at par, and we may now well adopt the language of the learned judge above quoted, that *"it was this value which the parties had in contemplation, and which was to extinguish the indebtedness."*

The case of *Hart* v. *Lauman* is by no means a controlling one in favor of the plaintiff here.

The resolution of July 9 has been above more particularly under examination, but that of February 2 is subject to the same rule of construction. They stand in the case alike in so far as any rule of construction is concerned.

The conclusion arrived at is that the referee was in error in holding that the resolutions contemplated and called for payment to the plaintiff's intestate, in stock and bonds at market value. We are of the opinion that payment in stock and bonds at par or nominal value was intended and stipulated for. The judgment must therefore be reversed.

The judgment is reversed and a new trial ordered, costs to abide the event, and the reference discharged.

MILLER, P. J., and BOARDMAN, J., concurred.

*Judgment accordingly.*